



86-14/DPM/MAM
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
ALASKA REEFER MANAGEMENT LLC
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900 / Facsimile: (212) 425-1901
Don P. Murnane, Jr.
Manuel A. Molina



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALASKA REEFER MANAGEMENT LLC,

        Plaintiff,

- against -

NETWORK SHIPPING LIMITED,

        Defendant.

14 Civ. ___ ( )

**VERIFIED COMPLAINT**

---

Plaintiff Alaska Reefer Management LLC ("Alaska Reefer" or "Plaintiff"), by and through its attorneys, Freehill Hogan & Mahar, LLP, for its Verified Complaint against Network Shipping Limited ("NSL"), alleges as follows:

1. This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for breach of maritime contracts of carriage.

**THE PARTIES**

2. At all times material hereto, Plaintiff Alaska Reefer was, and still is, a business entity duly organized and existing under the laws of the state of Washington, with an office located at 2025 First Avenue, Suite 1020, Seattle, Washington.

417397.1

3.     At all times material hereto, Defendant NSL was, and still is, a business entity organized and existing by virtue of the laws of Bermuda with an office and place of business located at 241 Sevilla Avenue, Coral Gables, Florida.

## BACKGROUND FACTS AND NATURE OF THE CLAIMS

### A. The MARBELLA CARRIER Charter Party

4.     On or about March 15, 2013, NSL, as disponent owner of the M/V MARBELLA CARRIER, entered into a maritime contract of charter party on an amended BALTIME 1939 form with Alaska Reefer, as charterer, for the use and operation of the vessel for "one TC [Time Charter] trip via GSP [Good Safe Ports] GS [Good Safe] berths always within IWL[International Warranty Limits]/INL [International Navigating Limits], ice free AAAA [Always Accessible Always Afloat] from Alaska to Continent range duration about 50-60 days WOG [Without Guarantee]" ("the MARBELLA CARRIER Charter"). A copy of the MARBELLA CARRIER Charter is annexed hereto as Exhibit A. The vessel was intended to transport "frozen fish in cartons up to the vessel's full capacity." *See* Exhibit A, Part I, Clause 17.

5.     NSL  delivered the vessel into Alaska Reefer's service under the MARBELLA CARRIER at Hong Kong on March 17, 2013.  Two days earlier, on March 15, 2013, Alaska Reefer had instructed the Master of the MARBELLA CARRIER to proceed to Dutch Harbor, Alaska to load a cargo of frozen fish.  Alaska Reefer's intention was to load cargo at Akutan and Dutch Harbor, ports located in the Aleutian Islands, with eventual discharge at three ports, namely, Bayside, Canada; Cuxhaven, Germany; and Ijmuiden, the Netherlands.

6.     En route to Dutch Harbor, however, the MARBELLA CARRIER developed various engine problems and other mechanical failures that required the Master to stop the vessel and attempt to carry out repairs. However, the vessel did not have sufficient spare parts onboard

to make the proper repairs. As a result of the vessel's engine breakdowns and other deficiencies, the vessel sailed at reduced speed and lost three days sailing time while steaming toward Dutch Harbor.

7.     The vessel arrived at Dutch Harbor on April 1, 2013.  The vessel arrived in distressed condition at the Kloosterboer Cold Storage dock. As a result of crane breakdowns, hatches failing to open and various hydraulic leaks on deck, cargo operations were delayed and disrupted, with Alaska Reefer being restricted with respect to the quantity of cargo it could load onboard. The U.S. Coast Guard advised it would inspect the vessel on April 3, but that, given its condition, it would likely issue Port State Control Reports identifying the vessel's deficiencies.

8.     After the Coast Guard inspection and before the Port State Control Reports issued, Alaska Reefer interrupted cargo operations and dispatched the MARBELLA CARRIER to anchorage so that the vessel's crew could rectify all the deficiencies that would be identified in the Port State Control Reports.

9.     Two days later, on April 5, the vessel sailed for the port of Akutan to load cargo at the Akutan Trident Dock.  While proceeding to Akutan, the vessel lost power and the pilot onboard requested tug assistance to escort the vessel into the port. Further, at arrival at Akutan, the vessel lost power again and the pilot ordered that the assisting tug remain with the MARBELLA CARRIER at all times.  After loading operations were completed on April 9, the vessel, being escorted by the tug as ordered by the pilot, sailed for Dutch Harbor to load the balance of the frozen fish cargo.

10.     As the MARBELLA CARRIER proceeded to Dutch Harbor, it again experienced engine problems, blacking out and losing power.  The vessel then drifted and the local pilot requested that a second tug be dispatched immediately from Dutch Harbor to deal with the

emergency situation. Eventually, two tugs escorted the MARBELLA CARRIER into Dutch Harbor.

11.    The vessel arrived at Dutch Harbor in the evening of April 9, berthing alongside the Kloosterboer Cold Storage dock.   Loading operations began later that evening and were stopped on April 10, at 0750 hours due to vessel deficiencies. Cargo operations did not resume until April 13 and were completed on April 14. Throughout the loading operations there were repeated ship crane breakdowns and hydraulic oil leaks on deck and it was discovered that the vessel's ballast system was inoperable.

12.    Although NSL had stipulated that the vessel could load up to the vessel's full capacity, in this case up to 8,100 net metric tons, Alaska Reefer was restricted to load only 7,354.8 net MT.   This short loading of cargo (745.12 net MT) stemmed from the vessel's inoperable ballast system. The vessel could not properly empty its ballast tanks (more specifically, the forepeak ballast tank).  As a result, all cargo holds were not loaded to their available capacity upon departure.  When the vessel was delivered into service, Alaska Reefer had instructed NSL to maintain the ballasting system in good order and condition to ensure maximum cargo intake at loading.

13.    Because of the various deficiencies encountered by the vessel en route to and while at the port of Dutch Harbor, which deficiencies constituted breaches of the MARBELLA CARRIER Charter, Alaska Reefer was unable to load cargo in a timely fashion. The delays during the loading operations caused Alaska Reefer to incur extraordinary expenses in the storage and handling of the cargo as well as for the use of tug and pilot services.

14.    As a result of the various delays and stoppages in Dutch Harbor that stemmed from the MARBELLA CARRIER's mechanical failures and breakdowns, the shipping facilities

were unable to provide additional cargoes of frozen fish they had booked with another vessel operated by Alaska Reefer, the FRIO CHINANO, which vessel arrived after the MARBELLA CARRIER departed Dutch Harbor. These cargoes were shipped with Alaska Reefer's competitors and Alaska Reefer sustained damages thereby.

15.     The vessel departed from Dutch Harbor on April 14 en route to its first discharge port, Bayside, Canada, via the Panama Canal.

16.     While proceeding toward Panama, the MARBELLA CARRIER experienced additional engine problems that forced the vessel to reduce speed.

17.     The vessel commenced transiting the Panama Canal in the evening of May 7 but was detained by the Panama Canal Authority when heavy smoke was observed emanating from the funnel.  The Panamanian authorities required the vessel to transit using extra tugs and other services, which expenses Alaska Reefer had to incur as a result of the vessel's deficiencies.

18.     The vessel arrived at Bayside on May 16. Problems arose at discharge due to breakdown of some of the vessel's cranes.  Following the completion of cargo operations, the vessel sailed for Cuxhaven, the next discharge port.

19.     The MARBELLA CARRIER arrived at the Cuxhaven anchorage on May 26 and arrived at its designated berth on May 27.  As a result of the vessel's deficiencies, which constituted breaches of  the MARBELLA CARRIER Charter, there were again delays in the discharge operations.

20.     Following completion of cargo operations at Cuxhaven, the vessel then sailed for its final discharge port, Ijmuiden, in the Netherlands.  Here again, upon arrival, the vessel continued to  experience mechanical problems.

21.     Alaska Reefer redelivered the vessel to NSL at Ijmuiden on June 1, 2013.

417397.1

22.    Rider Clause 38 of the MARBELLA CARRIER Charter stipulates that, "[i]f upon the voyage speed be reduced by defect in or breakdown of any part of the Vessel's hull, machinery or equipment, the time so lost and the cost of any extra fuel consumed in consequence thereof and all extra expenses shall be deducted from hire."

23.    In light of the numerous vessel deficiencies and breakdowns throughout the performance of the subject voyage, the vessel's speed was reduced and excessive amounts of fuel were consumed.  As a result of NSL's breach of Rider Clause 38, Alaska Reefer sustained damages in respect of reduced speed and fuel consumption.

24.    The MARBELLA CARRIER Charter requires that the parties refer their disputes under the Charter to London arbitration, with such proceedings to be governed by English law and conducted in accordance with the London Maritime Arbitrators Association ("LMAA").  *See* Exhibit A, Part I, Clause 23 and Part II, Clause 22A.

25.    Pursuant to the parties' maritime contract, Alaska Reefer demanded arbitration in May 2013, and successfully applied to the London Arbitration Tribunal for a ruling granting it permission to inspect the MARBELLA CARRIER.

26.    Presently, as per the Tribunal's directive, Alaska Reefer must serve its Claim Submissions on May 30, 2014.[1]

27.    In the London Arbitration, Alaska Reefer will assert the following claims:

A. Fuel Credit from Hong Kong to Dutch Harbor
   (59.1 MT x $644/MT)                                          $38,060.40

B. Fuel Credit from Hong Kong to Dutch Harbor and
   while at Dutch Harbor (Master burned wrong fuel
   incorrectly used Low Sulfur)
   (159.9 MT x $141/MT ($785 LS- $644 HS))                      $22,545.90

---

[1]    On September 11, 2013, the MARBELLA CARRIER Tribunal issued an Interim Award denying NSL's application for unpaid hire in the sum of $62,301.45 and allowing Alaska Reefer to equitably set off certain claims.

417397.1

| | |
|---|---|
| C. Fuel Credit for Off-Hire/Stoppages at Dutch Harbor (65.9 MT x $644/MT) | $42,439.60 |
| D. Additional Tug and Pilot Expenses incurred at Dutch Harbor | $5,018.26 |
| E. Extraordinary Cold Storage Services at Dutch Harbor | $1,112.59 |
| F. Extraordinary Cargo Storage and Handling at Dutch Harbor because of vessel delays  Plaintiff was forced, *inter alia*, to rent containers to hold cargo | $725,514.92 |
| G. Short Loading of Cargo at Dutch Harbor (745.12 net MT x $220/MT) | $163,926.40 |
| H. Short Loading of Cargo at Dutch Harbor for the FRIO CHINANO (1,198 net MT x $220/MT) | $263,560.00 |
| I. Panama Canal Authority Detention Expenses incurred because of vessel's deficiencies | $14,183.83 |
| J. Fuel Credit During Sea Passage from Dutch Harbor to Panama Canal (359.5 MT x $644/MT) | $231,518.00 |
| K. Overtime Expenses at Ijmuiden | $12,028.50 |
| L. Extra Hire paid at Cuxhaven ($10,000 x 1.5 days) | $15,000.00 |
| M. Fuel Credit for vessel deficiencies and Master's negligence for consumption of gas oil (MGO) during voyage (71 MT x $296/MT ($940MGO/MT -$644HS/MT)) | $21,016.00 |
| N. Fees paid to Marine Surveyors and Consultants | $102,125.00 |
| **TOTAL** | **$1,658,049.40** |

28.     On the advice of English solicitors who are prosecuting Alaska Reefer's claims in London, Plaintiff will also be entitled to recover, upon an award on its favor, interest at the rate of 5%, per annum, compounded quarterly, for approximately 2 years (from June 1, 2013 to May 15, 2015, the expected date for the Tribunal's issuance of a Final Award), the period of time for

which English solicitors estimate the Tribunal will grant an award of interest.  Plaintiff thus estimates an award of interest in the sum of $169,009.80.

**B . The MURCIA CARRIER Charter Party**

29.    On or about March 15, 2013, NSL, as disponent owner of the M/V MURCIA CARRIER, entered into a maritime contract of charter party on an amended BALTIME 1939 form with Alaska Reefer, as charterer, for the use and operation of the vessel for "one TC trip via GSP GS berths always within IWL/INL, ice free AAAA from Alaska to Continent range duration about 50-60 days WOG" ("the MURCIA CARRIER Charter"). A copy of the MURCIA CARRIER Charter is annexed hereto as Exhibit B. The vessel was intended to transport "frozen fish in cartons up to the vessel's full capacity." *See* Exhibit B, Part I, Clause 17.

30.    NSL   delivered the vessel into Alaska Reefer's service under the MURCIA CARRIER at Hong Kong on or about March 23, 2013.  On this day, the Master received instructions from Alaska Reefer to proceed to Dutch Harbor to load a cargo of palletized block frozen fish. The cargo would be loaded at the Alaskan ports of Akutan and Dutch Harbor and would then be discharged in three ports: Bayside, Cuxhaven and Ijmuiden.

31.    As the MURCIA CARRIER sailed to Dutch Harbor from Hong Kong, it encountered considerable delays stemming from engine problems and other mechanical failures. As with the MARBELLA CARRIER, engine problems caused the Master to stop the vessel and/or reduce speed. The vessel was unseaworthy and lacked spare parts needed to make the engine repairs.  Because of the various engine problems and stoppages, the vessel was adrift for approximately six days.

32.    The vessel arrived at Dutch Harbor on April 13, twelve days behind its estimated arrival date.  In light of the various mechanical problems the MARBELLA CARRIER had

experienced 10 days before, the U.S. Coast Guard directed that no cargo operations would begin until the MURCIA CARRIER had passed all necessary inspections.  In consultation with Coast Guard personnel, Alaska Reefer dispatched the vessel to the Coast Guard berth for inspection and repairs.

33.     On April 17, Alaska Reefer instructed the vessel to shift from the Coast Guard berth to the Kloosterboer Cold Storage dock.  However, the Master was unable to start the main engine and tugs were thus required to tow the vessel to the loading berth as a dead ship.  Cargo operations commenced on April 17 and were completed three days later.  During this period of time, however, loading had to be suspended several times because the vessel suffered breakdowns in its Nos. 1 and 3 cranes and/or experienced other mechanical failures.

34.     Although NSL had stipulated that the vessel could load up to the vessel's full capacity, in this case up to 8,100 net MT, Alaska Reefer was restricted to load only 7,209.478 net MT. This short loading of 890.52 net MT stemmed from, *inter alia*, a defective ballasting system that Alaska Reefer had instructed NSL to maintain in good order and condition to maximize cargo intake at loading.  As a result of the vessel's malfunctioning ballast system, upon the vessel's departure, there were voids in cargo Holds 4A and 2A and most of Hold 1A was open.

35.     As a result of the various delays and stoppages in Dutch Harbor that stemmed from the MURCIA CARRIER's mechanical failures and breakdowns, the shipping facilities were unable to provide additional cargoes of frozen fish they had booked with another vessel operated by Alaska Reefer, the FRIO CHINANO, which vessel arrived after the MURCIA CARRIER departed Dutch Harbor. These cargoes were shipped with Alaska Reefer's competitors and Alaska Reefer sustained damages thereby.

417397.1

36.     The vessel sailed for Bayside, via the Panama Canal, on April 20. En route to Panama, it again experienced main engine problems. The crew was unable to perform proper repairs because of missing spare parts onboard. The vessel's breakdowns led to various stoppages and forced the Master to reduce speed.

37.     The vessel arrived at the Balboa anchorage (Panama) on May 6. However, as a consequence of engine problems and a non-functioning bow thruster, the vessel was treated as deficient by the Panama Canal authorities. The vessel was ordered to perform repairs which were carried out between May 6 and May 11. As a result, Alaska Reefer was twice forced to reschedule the vessel's Canal transit bookings.

38.     Also, because of the malfunctioning bow thruster, Alaska Reefer incurred extraordinary expenses in being forced to use additional tug assistance.

39.     The vessel proceeded to the discharge port of Bayside at reduced speed arriving there on May 19. During discharge, a leak was discovered in one of the cargo holds and the cargo had to be shifted to avoid damage. Alaska Reefer thereby incurred expenses for extraordinary cargo handling and services.

40.     The vessel departed for Cuxhaven on May 9, but again suffered more breakdowns and stoppages en route which caused the Master to proceed at reduced speed. Because of the delays, the vessel arrived at the Cuxhaven anchorage on June 1, several days behind schedule, and thus missed its transit window which delayed cargo discharge operations until June 4.

41.     After discharge was completed on June 4, the vessel departed for its final discharge port, Ijmuiden on June 4. Because of the delays encountered at Cuxhaven, the vessel missed its berthing slot in Ijmuiden. In addition, the vessel's cranes failed to work and the hatches were frozen shut. These conditions were caused by a leak from the vessel's fresh water

tanks. There were also icing problems in the cargo holds and the cargo had to be reconditioned. Alaska Reefer also incurred overtime charges from both the stevedores and the cold storage facility caused by the vessel's deficiencies and delays.

42.     On June 8, 2013, Alaska Reefer redelivered the MURCIA CARRIER to NSL at Ijmuiden.

43.     Rider Clause 38 of the MURCIA CARRIER Charter prescribes that, "[i]f upon the voyage speed be reduced by defect in or breakdown of any part of the Vessel's hull, machinery or equipment, the time so lost and the cost of any extra fuel consumed in consequence thereof and all extra expenses shall be deducted from hire."

44.     In light of the numerous vessel deficiencies and breakdowns throughout the performance of the subject voyage, the vessel's speed was reduced and excessive amounts of fuel were consumed.    As a result of NSL's breach of Rider Clause 38, Alaska Reefer sustained damages in respect of reduced speed and fuel consumption.

45.     The MURCIA CARRIER Charter provides that the parties' disputes under the Charter shall be referred to London Arbitration, with the application of English law and in accordance with the terms of the LMAA.  *See* Exhibit B, Part I, Clause 23 and Part II, Clause 22A.

46.     Pursuant to the parties' maritime contract, Alaska Reefer demanded arbitration in May 2013, and successfully applied to the London Arbitration Tribunal for a ruling granting it permission to inspect the MURCIA CARRIER.

47.     Presently, as per the Tribunal's directive, Alaska Reefer must serve its Claim Submissions on May 30, 2014.[2]

48.     In the London Arbitration, Alaska Reefer will assert the following claims:

| | | |
|---|---|---|
| A. | Fuel Credit for the Sea Passage from Hong Kong To Dutch Harbor  (199.7MT x $644/MT HS) | $128,606.80 |
| B. | Fuel Credit at Dutch Harbor (24.3 MT x $644/MT + 6.7 MT MGO x $940/MT) | $21,947.20 |
| C. | Short Loading of Cargo at Dutch Harbor (890.50 net MT x $220/MT) | $195,914.40 |
| D. | Short Loading of Cargo at Dutch Harbor for the FRIO CHINANO (1,198 net MT x $220/MT) | $263,560.00 |
| E. | Fuel Credit from Dutch Harbor to Panama (30MT x $644/MT HS and 1.1MT x $940/MT MGO) | $19,320.00 $1,034.00 |
| F. | Fuel Credit at Panama Canal (40.02 MT x $644/MT HS) | $25,772.88 |
| G. | Panama Canal Expenses | $6,750.00 |
| H. | Cargo Handling/Services Expenses at Bayside | $2,801.83 |
| I. | Fuel Credit from Bayside to Cuxhaven. (37.7 MT x $644/MT HS) | $24,278.80 |
| J. | Cargo Handling Expenses at Cuxhaven | $543.38. |
| K. | Extra Hire paid at Cuxhaven ($10,000 x 3 days) | $30,000.00 |
| L. | Ijmuiden Expenses | $30,688.48 |

---

[2]  On September 11, 2013, the MURCIA CARRIER Tribunal issued an Interim Award granting in part and denying in part  NSL's application for unpaid hire in the sum of $37,473.82.  The Tribunal allowed Alaska Reefer to equitably set off the sum of $29,270 against the unpaid hire.

| M. Fees paid to Marine Surveyors and Consultants | $86,900.00 |
| **TOTAL** | **$838,117.77**[3] |

49.     English solicitors who are prosecuting Alaska Reefer's claims in London, have advised that Plaintiff will also be entitled to recover, upon an award on its favor, interest at the rate of 5%, per annum, compounded quarterly, for approximately 2 years (from June 1, 2013 to May 15, 2015, the expected date for the issuance of a Final Award), the period of time for which English solicitors estimate the Tribunal will grant an award of interest. Plaintiff thus estimates an award of interest in the sum of $85,431.78.

## RULE B RELIEF

50.     This action is further brought to obtain security in aid of London arbitration proceedings and in respect to Plaintiff's claims against NSL, as outlined in paragraphs 27-28 and 48-49, which claims will be presented before and will be adjudicated by the constituted London Arbitral Tribunal.   Plaintiff reserves its right to have the merits of its claims determined in arbitration pursuant to 9 U.S.C §8.

51.     After investigation, and as set forth in the accompanying Affidavit of Manuel A. Molina, Defendant NSL cannot be "found" within this District for purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims.

52.     Based on Rider Clause 64 of the MARBELLA CARRIER and MURCIA CARRIER Charters, Defendant NSL maintains a bank account with Bank of America in New York City.   The Account Number appearing in Rider Clause 64 has been redacted pursuant to Federal Rule of Civil Procedure 5.2.   In addition, based on the investigations conducted by

---

[3] Alaska Reefer will also make a claim for stevedoring and cargo handling expenses at Ijmuiden, the Netherlands ($29,270) but this claim is not part of the instant Rule B application because the Tribunal allowed Alaska Reefer to equitably set off that claim against the unpaid hire.

Plaintiff, Defendant NSL also maintains a bank account at JP Morgan Chase Bank, NA (New York).

53.    As a result, Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, bank accounts, correspondent accounts, and/or letters of credit, of, belonging to, due or for the benefit of Defendant NSL (collectively hereinafter, "Assets"), including but not limited to Assets in its name and/or being held for its benefit, at Bank of America and JPMorgan Chase Bank, N.A., or at such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

54.    Pursuant to its Rule B maritime attachment application, Alaska Reefer seeks to attach the sum of USD $1,827,059.20 in connection with the MARBELLA CARRIER arbitration and the sum of USD $923,549.55 in connection with the MURCIA CARRIER arbitration.

55.    English solicitors have advised that, pursuant to English law, including but not limited to Section 63 of the English Arbitration Act of 1996, Plaintiff's anticipated attorneys' fees, arbitrators' fees and costs in the London arbitration are recoverable as part of Plaintiff's claims.

56.    English solicitors estimate that Alaska Reefer will incur approximately £320,000 (or $539,678.63 at the exchange rate of 1GBP = 1.686USD) in awardable attorneys' fees (£250,000), disbursements and costs of the arbitration (£70,000), for prosecuting its claims under both the MARBELLA CARRIER and the MURCIA CARRIER Charters in London.

57.    Therefore, the total sum sought to be attached pursuant to Rule B in connection with Plaintiff's claims under both the MARBELLA CARRIER and the MURCIA CARRIER Charters amounts to USD **$3,290,287.38** ($1,827,059.20 + $923,549.55 + $539,678.63).

WHEREFORE, Plaintiff ALASKA REEFER MANAGEMENT LLC prays:

a.    That process in due form of law according to the practice of this Court issue against Defendant NETWORK SHIPPING LIMITED, citing it to appear and answer the foregoing, failing which a default will be taken against Defendant;

b.    That because Defendant cannot be found within this District pursuant to Supplemental Rule B, that all tangible or intangible property of Defendant up to and including **USD $3,290,287.38** be restrained and attached, including, but not limited to any assets within this District comprising, *inter alia*, cash, funds, credits, debts, bank accounts, correspondent accounts, and/or letters of credit, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "Assets"), including but not limited to Assets in its name and/or being held for its benefit, at Bank of America, JPMorgan Chase Bank, N.A., or at such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

c.    That to ensure the attachment of Assets only to the extent they relate to Defendant, and to foster substantial economies in time and expense, a person over 18 years of age who is not a party to this action be appointed pursuant to Fed.R.Civ.P. 4(c) to serve process of maritime attachment and garnishment in this action, as set forth in the accompanying Affidavit of Manuel A. Molina.

d.    That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

e.      For such other, further and different relief as this Court may deem just and proper,

including but not limited to the entry of default as to any property seized in the

event a timely response is not filed.

Dated: New York, New York
       May 19, 2014

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Alaska Reefer Management LLC


By: _____
    Don P. Murnane, Jr.
    Manuel A. Molina
    80 Pine Street
    New York, NY  10005
    (212) 425-1900
    (212) 425-1901 fax

417397.1

## ATTORNEY VERIFICATION

State of New York     )

                     ) ss.:

County of New York  )

      Manuel A. Molina, being duly sworn, deposes and says:

      1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for the Plaintiff in this action. I have read the foregoing Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

      2.      The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding this claim.

      3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within the State of New York.

<div style="text-align:right">

_Manuel A. Molina_ (signature)

Manuel A. Molina
</div>

Sworn to before me this
19 day of May, 2014

_(signature)_

NOTARY PUBLIC

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Commission Expires October 31, 2017

417397.1

# EXHIBIT A

**BIMCO UNIFORM TIME-CHARTER**
**(AS REVISED 2001)**
**CODE NAME: "BALTIME 1939"**

PART I

Issued 1909; Amended 1911; 1912; 1920; 1939; 1950; 1974; and 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen

| | |
|---|---|
| **1. Shipbroker**<br>Ocean Reefer Services Limited<br>Orpington<br>Kent<br>UK | **2. Place and date of Charter**<br>Orpington, 15th March 2013 |
| **3. Owners/Place of business**<br>Network Shipping Limited<br>241 Sevilla Ave, Coral Gables<br>Florida, USA | **4. Charterers/Place of business**<br>Alaska Reefer Management LLC<br>Seattle, USA |
| **5. Vessel's Name**<br>Marbella Carrier | **6. GT/NT**<br>See Clause 26 |
| **7. Class**<br>See Clause 26 | **8. Indicated brake horse power (bhp)**<br>See Clause 26 |
| **9. Total tons d. w. (abt.) on summer freeboard**<br>See Clause 26 | **10. Cubic feet grain/bale capacity**<br>See Clause 26 |
| **11. Permanent bunkers (abt.)** | **12. Speed capability in knots (abt.) on a consumption in tons (abt.) of**<br>See Clause 26 |
| **13. Present position**<br>Trading | **14. Period of hire (Cl. 1)**<br>One TC trip via GSP GS berths always within IWL/INL ice free AAAA from Alaska to Continent range duration about 50-60 days WOG. |
| **15. Port of delivery (Cl. 1)**<br>APS 1SP Hong Kong | **16. Time of delivery (Cl. 1)**<br>17th – 19th March 2013. |

**17. (a) Trade limits (Cl. 2)**
Trade worldwide within IWL, excluding Cuba as long as current embargo prevails, UN embargoed countries and/or war like areas including Iran/Libya/TOC/Israel/Syria. Extra insurance for war risk and/or piracy areas to be arranged by Owners and additional premium cost on Charterers' account.

**(b) Cargo exclusions specially agreed**
Frozen fish in cartons up to vessel's full capacity which is always to be non-injurious to vessel and/or vessel's insulation, under/on decks.
No Open Sea trans-shipment operations.
Arms, ammunition, pitch, asphalt, chemicals, nuclear fuels/waste, radioactives, hides, all inflamables – injurious-hazardous goods as per IMO Code are further excluded. Also livestock and explosives.

| | |
|---|---|
| **18. Bunkers on re-delivery (state min. and max. quantity) (Cl. 5)**<br>See Clause 50. | **19. Charter hire (Cl. 6)**<br>US$ 10,000.00 per day including overtime. |

**20. Hire payment (state currency, method and place of payment, also beneficiary and bank account) (Cl. 6)**
US Dollars, 30 days in advance to Owners' nominated bank account as per Clause 64.

| | |
|---|---|
| **21. Place or range of re-delivery (Cl. 7)**<br>DOP 1SP Continent (Havre-Hamburg range) including SCUK in CHOPT | **22. Cancelling date (Cl. 21)**<br>2400hrs 19th March 2013 |
| **23. Dispute resolution (state 22(A), 22(B) or 22(C); if 22(C) agreed Place of Arbitration must be stated) (Cl. 22)**<br>London See Clause 22A | **24. Brokerage commission and to whom payable (Cl.24)**<br>2.5pct address commission plus 1.25pct to Ocean Reefer Services Limited |

**25. Numbers of additional clauses covering special provisions, if agreed**
Clauses 26 to 67.

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

| **Signature (Owners )** | **Signature (Charterers)** |
|---|---|
| | ALASKA REEFER<br>Alaska Reefer Management LLC<br>2025 First Avenue, Suite 999<br>Seattle, WA 98121 |

ORIGINAL

PART II
## "BALTIME 1939" Uniform Time-Charter (as revised 2001)

It is agreed betw een the party mentioned in Box 3 as Ow ners 1
of the Vessel named in Box 5 of the gross/net tonnage 2
indicated in Box 6, classed as stated in Box 7 and of indicated 3
brake horse pow er (bhp) as stated in Box 8, carrying about 4
the number of tons deadw eight indicated in Box 9 on 5
summer freeboard inclusive of bunkers, stores and 6
provisions, having as per builder's plan a cubic-feet grain/ 7
bale capacity as stated in Box 10, exclusive of permanent 8
bunkers, w hich contain about the number of tons stated in 9
Box 11, and fully loaded capable of steaming about the 10
number of knots indicated in Box 12 in good w eather and 11
smooth w ater on a consumption of about the number of 12
tons fuel oil stated in Box 12, now in position as stated in 13
Box 13 and the party mentioned as Charterers in Box 4, as 14
follow s: 15

### 1. Period/Port of Delivery/Time of Delivery 16
The Ow ners let, and the Charterers hire the Vessel for a 17
period of the number of calendar months indicated in 18
Box 14 from the time ~~(not a Sunday or a legal Holiday~~ 19
~~unless taken over)~~ the Vessel is delivered and placed at 20
the disposal of the Charterers ~~betw een 9 a.m. and 6~~ 21
~~p.m., or betw een 9 a.m. and 2 p.m. if on Saturday,~~ at the 22
port stated in Box 15 in such available berth w here she 23
can safely lie alw ays afloat, as the Charterers may direct, 24
the Vessel being in every w ay fitted for ~~ordinary~~ frozen fish 25
cargo
service. The Vessel shall be delivered at the time 26
indicated in Box 16. 27

### 2. Trade 28
The Vessel shall be employed in law ful trades for the 29
carriage of law ful merchandise only betw een safe ports 30
or places w here the Vessel can safely lie alw ays afloat 31
w ithin the limits stated in Box 17. No stock nor 32
injurious, inflammable or dangerous goods (such as 33
acids, explosives, calcium carbide, ferro silicon, 34
naphtha, motor spirit, tar, or any of their products) shall 35
be shipped. 36

### 3. Owners' Obligations 37
The Ow ners shall provide and pay for all provisions and 38
Wages, for insurance of the Vessel, for all deck and 39
Engine-room stores and maintain her in a thoroughly 40
efficient state in hull and machinery during service. The 41
Ow ners shall provide w inchmen from the crew to 42
operate the Vessel's cargo handling gear, unless the 43
crew 's employment conditions or local union or port 44
regulations prohibit this, in w hich case qualified shore- 45
w inchmen shall be provided and paid for by the 46
Charterers. 47

### 4. Charterers' Obligations 48
The Charterers shall provide and pay for all fuel oil, port 49
charges, pilotages (w hether compulsory or not), canal 50
steersmen, boatage, lights, tug-assistance, consular 51
charges (except those pertaining to the Master, officers 52
and crew), canal, dock and other dues and charges, 53
including any foreign general municipality or state taxes, 54
also all dock, harbour and tonnage dues at the ports of 55
delivery and re-delivery (unless incurred through cargo 56
carried before delivery or after re-delivery), agencies, 57
commissions, also shall arrange and pay for loading, 58
trimming, stow ing (including dunnage and shifting 59
boards, excepting any already on board), unloading, 60
w eighing, tallying and delivery of cargoes, surveys on 61
hatches, meals supplied to officials and men in their 62
service and all other charges and expenses w hatsoever 63
including detention and expenses through quarantine 64
(including cost of fumigation and disinfection). All ropes, 65
slings and special runners actually used for loading 66

and discharging and any special gear, including special 67
ropes and chains required by the custom of the port for 68
mooring shall be for the Charterers' account. The Vessel 69
shall be fitted w ith w inches, derricks, w heels and or- 70
dinary runners capable of handling lifts ~~up to 2 tons~~ as per 71
vessel's description. 72

### 5. Bunkers See Clause 50 72
~~The Charterers at port of delivery and the Ow ners at port~~ 73
~~of re-delivery shall take-over and pay for all fuel oil~~ 74
~~remaining in the Vessel's bunkers at current price at the~~ 75
~~respective ports. The Vessel shall be re-delivered w ith~~ 76
~~not less than the number of tons and not exceeding the~~ 77
~~number of tons of fuel oil in the Vessel's bunkers stated~~ 78
~~in Box 18.~~ 79

### 6. Hire 80
The Charterers shall pay as hire the rate stated in Box 81
19 per 30 days, commencing in accordance with Clause 82
1 until her re-delivery to the Ow ners. 83
Payment of hire shall be made in cash, in the currency 84
stated in Box 20, w ithout discount, every 30 days, in 85
advance, and in the manner prescribed in Box 20. In 86
default of payment the Ow ners shall have the right of 87
w ithdraw ing the Vessel from the service of the Charterers, 88
w ithout noting any protest and w ithout interference by 89
any court or any other formality w hatsoever and without 90
prejudice to any claim the Ow ners may otherwise have 91
on the Charterers under the Charter. 92

### 7. Re-delivery 93
The Vessel shall be re-delivered on the expiration of the 94
Charter in the same good order as w hen delivered to 95
the Charterers (fair w ear and tear excepted) at an ice- 96
free port in the Charterers' option at the place or w ithin 97
the range stated in Box 21, ~~betw een 9 a.m. and 6 p.m.,~~ 98
~~and 9 a.m. and 2 p.m. on Saturday, but the day of re-~~ 99
~~delivery shall not be a Sunday or legal Holiday.~~ 100
The Charterers shall give the Ow ners not less than fifteen 101
and ten
days' notice and 5,3,1 days precise notice at w hich port 102
and on about w hich day the
Vessel w ill be re-delivered. Should the Vessel be ordered 103
on a voyage by w hich the Charter period w ill be exceeded 104
the Charterers shall have the use of the Vessel to enable 105
them to complete the voyage, provided it could be 106
reasonably calculated that the voyage w ould allow 107
redelivery about the time fixed for the termination of the 108
Charter, but for any time exceeding the termination date 109
the Charterers shall pay the market rate if higher than 110
the rate stipulated herein. 111

### 8. Cargo Space 112
The w hole reach and burthen of the Vessel, including 113
law ful deck-capacity shall be at the Charterers' disposal, 114
reserving proper and sufficient space for the Vessel's 115
Master, officers, crew, tackle, apparel, furniture, 116
provisions and stores. 117

### 9. Master 118
The Master shall prosecute all voyages w ith the utmost 119
despatch and shall render customary assistance w ith 120
the Vessel's crew. The Master shall be under the orders 121
of the Charterers as regards employment, agency, or 122
other arrangements. The Charterers shall indemnify the 123
Ow ners against all consequences or liabilities arising 124
from the Master, officers or Agents signing Bills of Lading 125
or other documents or otherw ise complying w ith such 126
orders, as w ell as from any irregularity in the Vessel's 127
papers or for overcarrying goods. The Ow ners shall not 128
be responsible for shortage, mixture, marks, nor for 129
Number of pieces or packages, nor for damage to or 130
claims on cargo caused by bad stow age or otherw ise. If 131

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document, and this computer generated document.

PART II
## "BALTIME 1939" Uniform Time-Charter (as revised 2001)

the Charterers have reason to be dissatisfied with the | 132
conduct of the Master or any officer, the Owners, on | 133
receiving particulars of the complaint, promptly to | 134
investigate the matter, and, if necessary and practicable, | 135
to make a change in the appointments. | 136

**10. Directions and Logs** | 137
The Charterers shall furnish the Master with all | 138
instructions and sailing directions and the Master shall | 139
keep full and correct logs accessible to the Charterers | 140
or their Agents. | 141

**11. Suspension of Hire etc.** | 142
(A) In the event of drydocking or other necessary | 143
measures to maintain the efficiency of the Vessel, | 144
deficiency of men or Owners' stores, breakdown of | 145
machinery, damage to hull or other accident, either | 146
hindering or preventing the working of the Vessel and | 147
continuing for more than ~~twenty-four~~ 12 consecutive hours, | 148
no hire shall be paid in respect of any time lost thereby | 149
during the period in which the Vessel is unable to perform | 150
the service immediately required. Any hire paid in | 151
advance shall be adjusted accordingly. | 152
(B) In the event of the Vessel being driven into port or to | 153
anchorage through stress of weather, trading to shallow | 154
harbours or to rivers or ports with bars or suffering an | 155
accident to her cargo, any detention of the Vessel and/or | 156
expenses resulting from such detention shall be for the | 157
Charterers' account even if such detention and/or | 158
expenses, or the cause by reason of which either is | 159
incurred, be due to, or be contributed to by, the | 160
negligence of the Owners' servants. | 161

**12. Responsibility and Exemption** | 162
The Owners only shall be responsible for delay in | 163
delivery of the Vessel or for delay during the currency of | 164
the Charter and for loss or damage to goods onboard, if | 165
such delay or loss has been caused by want of due | 166
diligence on the part of the Owners or their Manager in | 167
making the Vessel seaworthy and fitted for the voyage | 168
or any other personal act or omission or default of the | 169
Owners or their Manager. The Owners shall not be | 170
responsible in any other case nor for damage or delay | 171
whatsoever and howsoever caused even if caused by | 172
the neglect or default of their servants. The Owners shall | 173
not be liable for loss or damage arising or resulting | 174
from strikes, lock-outs or stoppage or restraint of labour | 175
(including the Master, officers or crew) whether partial | 176
or general. The Charterers shall be responsible for loss | 177
or damage caused to the Vessel or to the Owners by | 178
goods being loaded contrary to the terms of the Charter | 179
or by improper or careless bunkering or loading, stowing | 180
or discharging of goods or any other improper or | 181
negligent act on their part or that of their servants. | 182

**13. Advances** | 183
The Charterers or their Agents shall advance to the | 184
Master, if required, necessary funds for ordinary | 185
disbursements for the Vessel's account at any port | 186
charging only interest at 6 2.5 per cent. p.a., such advances | 187
shall be deducted from hire. | 188

**14. Excluded Ports** | 189
The Vessel shall not be ordered to nor bound to enter: | 190
(A) any place where fever or epidemics are prevalent or | 191
to which the Master, officers and crew by law are not | 192
bound to follow the Vessel; | 193
(B) any ice-bound place or any place where lights, | 194
lightships, marks and buoys are or are likely to be | 195
withdrawn by reason of ice on the Vessel's arrival or | 196
where there is risk that ordinarily the Vessel will not be | 197
able on account of ice to reach the place or to get out | 198

after having completed loading or discharging. The | 199
Vessel shall not be obliged to force ice. If on account of | 200
ice the Master considers it dangerous to remain at the | 201
loading or discharging place for fear of the Vessel being | 202
frozen in and/or damaged, he has liberty to sail to a | 203
convenient open place and await the Charterers' fresh | 204
instructions. Unforeseen detention through any of above | 205
causes shall be for the Charterers' account. | 206

**15. Loss of Vessel** | 207
Should the Vessel be lost or missing, hire shall cease | 208
from the date when she was lost. If the date of loss | 209
cannot be ascertained half hire shall be paid from the | 210
date the Vessel was last reported until the calculated | 211
date of arrival at the destination. Any hire paid in advance | 212
shall be adjusted accordingly. | 213

**16. Overtime** | 214
~~The Vessel shall work day and night if required. The~~ | 215
~~Charterers shall refund the Owners their outlays for all~~ | 216
~~overtime paid to officers and crew according to the hours~~ | 217
~~and rates stated in the Vessel's articles.~~ | 218

**17. Lien** | 219
The Owners shall have a lien upon all cargoes and | 220
sub-freights belonging to the Time-Charterers and any | 221
Bill of Lading freight for all claims under this Charter, | 222
and the Charterers shall have a lien on the Vessel for all | 223
moneys paid in advance and not earned. | 224

**18. Salvage** | 225
All salvage and assistance to other vessels shall be for | 226
the Owners' and the Charterers' equal benefit after | 227
deducting the Master's, officers' and crew's proportion | 228
and all legal and other expenses including hire paid | 229
under the charter for time lost in the salvage, also repairs | 230
of damage and fuel oil consumed. The Charterers shall | 231
be bound by all measures taken by the Owners in order | 232
to secure payment of salvage and to fix its amount. | 233

**19. Sublet** | 234
The Charterers shall have the option of subletting the | 235
Vessel, giving due notice to the Owners, but the original | 236
Charterers shall always remain responsible to the | 237
Owners for due performance of the Charter. | 238

**20. War** ~~("Conwartime 1993")~~ See Clause 65 | 239
~~(A) For the purpose of this Clause, the words:~~ | 240
~~(i) "Owners" shall include the shipowners, bareboat~~ | 241
~~charterers, disponent owners, managers or other~~ | 242
~~operators who are charged with the management of the~~ | 243
~~Vessel, and the Master; and~~ | 244
~~(ii) "War Risks" shall include any war (whether actual or~~ | 245
~~threatened), act of war, civil war, hostilities, revolution,~~ | 246
~~rebellion, civil commotion, warlike operations, the laying~~ | 247
~~of mines (whether actual or reported), acts of piracy,~~ | 248
~~acts of terrorists, acts of hostility or malicious damage,~~ | 249
~~blockades (whether imposed against all vessels or~~ | 250
~~imposed selectively against vessels of certain flags or~~ | 251
~~ownership, or against certain cargoes or crews or~~ | 252
~~otherwise howsoever), by any person, body, terrorist or~~ | 253
~~political group, or the Government of any state~~ | 254
~~whatsoever, which, in the reasonable judgement of the~~ | 255
~~Master and/or the Owners, may be dangerous or are~~ | 256
~~likely to be or to become dangerous to the Vessel, her~~ | 257
~~cargo, crew or other persons on board the Vessel.~~ | 258
~~(B) The Vessel, unless the written consent of the Owners~~ | 259
~~be first obtained, shall not be ordered to or required to~~ | 260
~~continue to or through, any port, place, area or zone~~ | 261
~~(whether of land or sea), or any waterway or canal, where~~ | 262
~~it appears that the Vessel, her cargo, crew or other~~ | 263
~~persons on board the Vessel, in the reasonable~~ | 264

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

judgement of the Master and/or the Owners, may be, or    265
are likely to be, exposed to War Risks. Should the Vessel    266
be within any such place as aforesaid, which only    267
becomes dangerous, or is likely to be or to become    268
dangerous, after her entry into it, she shall be at liberty    269
to leave it.    270
(C) The Vessel shall not be required to load contraband    271
cargo, or to pass through any blockade, whether such    272
blockade be imposed on all vessels, or is imposed    273
selectively in any way whatsoever against vessels of    274
certain flags or ownership, or against certain cargoes    275
or crew or otherwise howsoever, or to proceed to an    276
area where she shall be subject, or is likely to be subject    277
to a belligerent's right of search and/or confiscation.    278
(D) (i) The Owners may effect war risks insurance in    279
respect of the Hull and Machinery of the Vessel and their    280
other interests (including, but not limited to, loss of    281
earnings and detention, the crew and their Protection    282
and Indemnity Risks), and the premiums and/or calls    283
therefor shall be for their account.    284
(ii) If the Underwriters of such insurance should require    285
payment of premiums and/or calls because, pursuant    286
to the Charterers' orders, the Vessel is within, or is due    287
to enter and remain within, any area or areas which are    288
specified by such Underwriters as being subject to    289
additional premiums because of War Risks, then such    290
premiums and/or calls shall be reimbursed by the    291
Charterers to the Owners at the same time as the next    292
payment of hire is due.    293
(E) If the Owners become liable under the terms of    294
employment to pay to the crew any bonus or additional    295
wages in respect of sailing into an area which is    296
dangerous in the manner defined by the said terms,    297
then such bonus or additional wages shall be re-    298
imbursed to the Owners by the Charterers at the same    299
time as the next payment of hire is due.    300
(F) The Vessel shall have liberty:-    301
(i) to comply with all orders, directions, recom-    302
mendations or advice as to departure, arrival, routes,    303
sailing in convoy, ports of call, stoppages, destinations,    304
discharge of cargo, delivery, or in any other way    305
whatsoever, which are given by the Government of the    306
Nation under whose flag the Vessel sails, or other    307
Government to whose laws the Owners are subject, or    308
any other Government, body or group whatsoever acting    309
with the power to compel compliance with their orders    310
or directions;    311
(ii) to comply with the order, directions or recom-    312
mendations of any war risks underwriters who have the    313
authority to give the same under the terms of the war    314
risks insurance;    315
(iii) to comply with the terms of any resolution of the    316
Security Council of the United Nations, any directives of    317
the European Community, the effective orders of any    318
other Supranational body which has the right to issue    319
and give the same, and with national law aimed at    320
enforcing the same to which the Owners are subject,    321
and to obey the orders and directions of those who are    322
charged with their enforcement;    323
(iv) to divert and discharge at any other port any cargo or    324
part thereof which may render the Vessel liable to    325
confiscation as a contraband carrier;    326
(v) to divert and call at any other port to change the crew    327
or any part thereof or other persons on board the Vessel    328
when there is reason to believe that they may be subject    329
to internment, imprisonment or other sanctions.    330
(G) If in accordance with their rights under the foregoing    331
provisions of this Clause, the Owners shall refuse to    332
proceed to the loading or discharging ports, or any one    333
or more of them, they shall immediately inform the    334
Charterers. No cargo shall be discharged at any    335
alternative port without first giving the Charterers notice    336
of the Owners' intention to do so and requesting them    337
to nominate a safe port for such discharge. Failing such    338
nomination by the Charterers within 48 hours of the    339
receipt of such notice and request, the Owners may    340
discharge the cargo at any safe port of their own choice.    341
(H) If in compliance with any of the provisions of sub-    342
clauses (B) to (G) of this Clause anything is done or not    343
done, such shall not be deemed a deviation, but shall    344
be considered as due fulfilment of this Charter.    345

**21. Cancelling**    346
Should the Vessel not be delivered by the date indicated    347
in Box 22, the Charterers shall have the option of    348
cancelling. If the Vessel cannot be delivered by the    349
cancelling date, the Charterers, if required, shall declare    350
within 48 hours after receiving notice thereof whether    351
they cancel or will take delivery of the Vessel.    352

**22. Dispute Resolution**    353
*) (A) This Charter shall be governed by and construed in    354
accordance with English law and any dispute arising    355
out of or in connection with this Charter shall be referred    356
to arbitration in London in accordance with the Arbitration    357
Act 1996 or any statutory modification or re-enactment    358
thereof save to the extent necessary to give effect to the    359
provisions of this Clause.    360
The arbitration shall be conducted in accordance with    361
the London Maritime Arbitrators Association (LMAA)    362
Terms current at the time when the arbitration    363
proceedings are commenced.    364
The reference shall be to three arbitrators. A party    365
wishing to refer a dispute to arbitration shall appoint its    366
arbitrator and send notice of such appointment in writing    367
to the other party requiring the other party to appoint its    368
own arbitrator within 14 calendar days of that notice and    369
stating that it will appoint its arbitrator as sole arbitrator    370
unless the other party appoints its own arbitrator and    371
gives notice that it has done so within the 14 days    372
specified. If the other party does not appoint its own    373
arbitrator and give notice that it has done so within the    374
14 days specified, the party referring a dispute to    375
arbitration may, without the requirement of any further    376
prior notice to the other party, appoint its arbitrator as    377
sole arbitrator and shall advise the other party    378
accordingly. The award of a sole arbitrator shall be    379
binding on both parties as if he had been appointed by    380
agreement.    381
Nothing herein shall prevent the parties agreeing in    382
writing to vary these provisions to provide for the    383
appointment of a sole arbitrator.    384
In cases where neither the claim nor any counterclaim    385
exceeds the sum of US$50,000 (or such other sum as    386
the parties may agree) the arbitration shall be conducted    387
in accordance with the LMAA Small Claims Procedure    388
current at the time when the arbitration proceedings are    389
commenced.    390
*) (B) This Charter shall be governed by and construed in    391
accordance with Title 9 of the United States Code and    392
the Maritime Law of the United States and any dispute    393
arising out of or in connection with this Contract shall    394
be referred to three persons at New York, one to be    395
appointed by each of the parties hereto, and the third by    396
the two so chosen; their decision or that of any two of    397
them shall be final, and for the purposes of enforcing    398
any award, judgement may be entered on an award by    399
any court of competent jurisdiction. The proceedings    400
shall be conducted in accordance with the rules of the    401

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### "BALTIME 1939" Uniform Time-Charter (as revised 2001)

| | |
|---|---|
| ~~Society of Maritime Arbitrators, Inc.~~ | 402 |
| ~~In cases where neither the claim nor any counterclaim~~ | 403 |
| ~~exceeds the sum of US$50,000 (or such other sum as~~ | 404 |
| ~~the parties may agree) the arbitration shall be conducted~~ | 405 |
| ~~in accordance with the Shortened Arbitration Procedure~~ | 406 |
| ~~of the Society of Maritime Arbitrators, Inc. current at the~~ | 407 |
| ~~time when the arbitration proceedings are commenced.~~ | 408 |
| *) ~~(C) This Charter shall be governed by and construed in~~ | 409 |
| ~~accordance with the laws of the place mutually agreed~~ | 410 |
| ~~by the parties and any dispute arising out of or in~~ | 411 |
| ~~connection with this Charter shall be referred to~~ | 412 |
| ~~arbitration at a mutually agreed place, subject to the~~ | 413 |
| ~~procedures applicable there.~~ | 414 |
| ~~(D) Notwithstanding (A), (B) or (C) above, the parties~~ | 415 |
| ~~may agree at any time to refer to mediation any difference~~ | 416 |
| ~~and/or dispute arising out of or in connection with this~~ | 417 |
| ~~Charter.~~ | 418 |
| ~~In the case of a dispute in respect of which arbitration~~ | 419 |
| ~~has been commenced under (A), (B) or (C) above, the~~ | 420 |
| ~~following shall apply:-~~ | 421 |
| ~~(i) Either party may at any time and from time to time~~ | 422 |
| ~~elect to refer the dispute or part of the dispute to~~ | 423 |
| ~~mediation by service on the other party of a written notice~~ | 424 |
| ~~(the "Mediation Notice") calling on the other party to agree~~ | 425 |
| ~~to mediation.~~ | 426 |
| ~~(ii) The other party shall thereupon within 14 calendar~~ | 427 |
| ~~days of receipt of the Mediation Notice confirm that they~~ | 428 |
| ~~agree to mediation, in which case the parties shall~~ | 429 |
| ~~thereafter agree a mediator within a further 14 calendar~~ | 430 |
| ~~days, failing which on the application of either party a~~ | 431 |
| ~~mediator will be appointed promptly by the Arbitration~~ | 432 |
| ~~Tribunal ("the Tribunal") or such person as the Tribunal~~ | 433 |
| ~~may designate for that purpose. The mediation shall~~ | 434 |
| ~~be conducted in such place and in accordance with such~~ | 435 |
| ~~procedure and on such terms as the parties may agree~~ | 436 |
| ~~or, in the event of disagreement, as may be set by the~~ | 437 |
| ~~mediator.~~ | 438 |
| ~~(iii) If the other party does not agree to mediate, that fact~~ | 439 |
| ~~may be brought to the attention of the Tribunal and may~~ | 440 |
| ~~be taken into account by the Tribunal when allocating~~ | 441 |
| ~~the costs of the arbitration as between the parties.~~ | 442 |
| ~~(iv) The mediation shall not affect the right of either party~~ | 443 |

~~to seek such relief or take such steps as it considers~~ 444
~~necessary to protect its interest.~~ 445
~~(v) Either party may advise the Tribunal that they have~~ 446
~~agreed to mediation. The arbitration procedure shall~~ 447
~~continue during the conduct of the mediation but the~~ 448
~~Tribunal may take the mediation timetable into account~~ 449
~~when setting the timetable for steps in the arbitration.~~ 450
~~(vi) Unless otherwise agreed or specified in the~~ 451
~~mediation terms, each party shall bear its own costs~~ 452
~~incurred in the mediation and the parties shall share~~ 453
~~equally the mediator's costs and expenses.~~ 454
~~(vii) The mediation process shall be without prejudice~~ 455
~~and confidential and no information or documents~~ 456
~~disclosed during it shall be revealed to the Tribunal~~ 457
~~except to the extent that they are disclosable under the~~ 458
~~law and procedure governing the arbitration.~~ 459
~~(Note: The parties should be aware that the mediation~~ 460
~~process may not necessarily interrupt time limits.)~~ 461
~~(E) If Box 23 in Part I is not appropriately filled in, sub-~~ 462
~~clause (A) of this Clause shall apply. Sub-clause (D)~~ 463
~~shall apply in all cases.~~ 464

\* *(A), (B) and (C) are alternatives; indicate alternative* 465
*agreed in Box 23.* 466

**23. General Average** 467
General Average shall be settled according to York/ 468
Antwerp Rules, 1994 and any subsequent modification 469
thereof. Hire shall not contribute to General Average. 470

**24. Commission** 471
The Owners shall pay a commission at the rate stated 472
in Box 24 to the party mentioned in Box 24 on any hire 473
paid under the Charter, but in no case less than is 474
necessary to cover the actual expenses of the Brokers 475
and a reasonable fee for their work. If the full hire is not 476
paid owing to breach of Charter by either of the parties 477
the party liable therefor shall indemnify the Brokers 478
against their loss of commission. Should the parties 479
agree to cancel the Charter, the Owners shall indemnify 480
the Brokers against any loss of commission but in such 481
case the commission not to exceed the brokerage 482
on one year's hire. 483

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013        2nd ORIGINAL
MARBELLA CARRIER

CLAUSE 26   VESSEL DESCRIPTION

CLAUSE 27   GRATINGS

CLAUSE 28   REFRIGERATION MACHINERY

CLAUSE 29   REFRIGERATION

CLAUSE 30   DISTANCE THERMOMETERS

CLAUSE 31   SPEED AND CONSUMPTION

CLAUSE 32   ELECTRIC LIGHT

CLAUSE 33   STEVEDORE DAMAGE

CLAUSE 34   BREAKDOWN OF WINCHES

CLAUSE 35   VESSEL CERTIFICATES

CLAUSE 36   INSURANCE PREMIUM

CLAUSE 37   SUPERCARGO

CLAUSE 38   DETENTION/OFF-HIRE/PUT BACK

CLAUSE 39   CARGO

CLAUSE 40   TYPES OF CARGO

CLAUSE 41   STOWAWAYS

CLAUSE 42   U.S. CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE
            FOR TIME CHARTER PARTIES/EU CARGO DECLARATION

CLAUSE 43   OWNERS' RESPONSIBILITY

CLAUSE 44   CLEANING OF HOLDS

CLAUSE 45   INSURANCE

CLAUSE 46   WATCHMEN

CLAUSE 47   ON/OFF HIRE SURVEY

1



**RIDER CLAUSES FOR**                            2ⁿᵈ ORIGINAL
**CHARTER PARTY 15 MARCH 2013**
**MARBELLA CARRIER**

CLAUSE 48   CONTRABAND

CLAUSE 49   BILLS OF LADING

CLAUSE 50   BUNKER CLAUSE

CLAUSE 51   INCLUDED CLAUSES AND GENERAL AVERAGE

CLAUSE 52   GOVERNING TIME

CLAUSE 53   HOUSE FLAG & FUNNEL

CLAUSE 54   CONFIDENTIALITY

CLAUSE 55   OWNERS AGENCY SERVICES

CLAUSE 56   CONTAINERS ON DECK

CLAUSE 57   VESSEL'S MANNING

CLAUSE 58   MISCELLANEOUS VOYAGE EXPENSES

CLAUSE 59   EXTRA INSURANCE

CLAUSE 60   GOVERNING LAW

CLAUSE 61   FUEL SULPHUR CONTENT CLAUSE

CLAUSE 62   WEATHER ROUTING

CLAUSE 63   ISPS CLAUSE FOR TIME CHARTERS

CLAUSE 64   OWNERS' BANK DETAILS AND NON-PAYMENT OF HIRE

CLAUSE 65   WAR RISKS

CLAUSE 66   ICE CLAUSE

CLAUSE 67   BALLAST BONUS

CLAUSE 68   BOTH TO BLAME COLLISION CLAUSE

CLAUSE 69   GENERAL AVERAGE AND THE NEW JASON CLAUSE

RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

2nd ORIGINAL

## CLAUSE 26 -- VESSEL DESCRIPTION

**Del Monte**     **N ORBULK**

| | |
|---|---|
| Vessel Name | MARBELLA CARRIER |
| Owners full style | GIRALDA SHIPPING CORPORATION |
| Built | 1996 STOCZNIA GDANSK POLAND |
| Flag | PANAMA |
| Call Sign | 3FJE9 |
| Inmarsat C | 435261010 |
| Telephone | 765110965, 765110961  Mobile: + 44 7972660351   Iridium 00881677729209 |
| | 765110967 |
| Facsimile | |
| Email | master.marbella@norbulkglw.co.uk |
| Class | BUREAU VERITAS   BV IE/3E ICE III |
| GRT/NRT | 9438 / 4037 |
| Panama GRT/NRT | /7967 |
| Suez GRT/NRT | 10195/7443 |
| DWT/Draft | 9357  8.85m   Banana Draft 7.00M |
| Cft/Sqm | 427,806 , 4,948 |
| LOA/LBP/Breadth/Dep | 137.7M, 128.7M , 21.5M, 13.15M |
| Light Weight | 5,686 |

| | | |
|---|---|---|
| Con.Cap.on deck | 99TEU | 62FEU |
| Under Deck | 62TEU | 32FEU |
| Cont.stack weight (MT) | | |
| Reefer Plugs | 52 | |

**Speed/Consumption(Fuel Quality)**

| | | 17.0 | 18.0 | 19.0 | 20 | Aux Engines at sea | |
|---|---|---|---|---|---|---|---|
| AT FULL SPEED | | | | | | 3.5 | |
| A/Eng Consumption | HFO Ballast | 28.0 | 31.0 | 34.0 | 38 | | |
| Included in daily fig. | | | | | | | |
| | HFO Banana | 31.0 | 32.5 | 38.0 | 40.5 | 5.5 | |

| Bunker's capacity | | | | |
|---|---|---|---|---|
| 100% Cu.Mtrs. | ifo 1,350 | mdo 150 | cst 380 | fw 245 |
| MAX RPM/BHP | 122 RPM, 13423 BHP |
| Engine Type | MAN B&W MC50 (10.010kw) AT 127rpm |
| Vent/Air circulation | 2/1 P/HOUR 90/60/30 P/HOUR |
| Generators | Bergen x 1.020kw x 4 units     440V - 60hz |
| Temperature Range | -25c - +15c |
| C.A.fitted | Piping fitted CA Module to be installed |
| Type of gear/capacity | 4 cranes  2x32tonnes 2x8tonnes |
| Hold/Hatches/Comp. | 4 holds/ 16 decks   4 side doors |
| Grating deck strength | Fork Lift 7.0 m/ts on pneumatic tyres |
| Hold deck height | 2.27 minimxim "B" deck no 1 hold. |
| Cooling Sections | 8 |
| Hatch Demensions | Wx Deck 10.070mx9.780m |

| | NO.1 | | NO2 | | NO.3 | | NO.4 | |
|---|---|---|---|---|---|---|---|---|
| H/C | CU FT | SQ M | CU FT | SQ M | CU FT | SQ M | CU FT | SQ M |
| FCSL | 39,270 | 404 | | | | | | |
| A | 29,382 | 331 | 33,691 | 358 | 35,209 | 348.0 | 33,479 | 343 |
| B | 16,881 | 192.0 | 27,087 | 341 | 28,605 | 355 | 29,064 | 381 |
| C | 9358 | 118 | 22,248 | 271 | 28,817 | 363 | 28,994 | 351 |
| D | | | 16669 | 206 | 27051 | 326 | 22001 | 270 |
| Totals | 94,891 | 1045 | 99,696 | 1176.0 | 119,682 | 1,382.0 | 113,538 | 1345 |

*All above figures are about but WOG*



RIDER CLAUSES FOR          2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

## CLAUSE 27 - GRATINGS

The Vessel is to be fitted with portable gratings on all the decks.  Maintenance of the gratings is to be for Owners' account, unless damage caused by negligence of stevedores during cargo operations.

## CLAUSE 28 – REFRIGERATION MACHINERY

The Vessel's refrigeration machinery and insulation will maintain, simultaneously, separate temperatures in each of her eight (8) cooling sections as required by the Charterers but not below minus 25 degrees Celsius, during the whole duration of any voyage for carrying full cargoes of frozen fish and/or other frozen food commodities. The refrigeration machinery and appliances in the Vessel shall at all times be up to Lloyd's R.M.C. or equivalent and are to be maintained in that class for the whole duration of this Charter.

## CLAUSE 29 – REFRIGERATION

The Owners shall at all times provide a valid refrigeration certificate issued by a recognized classification society attesting the good working order of the vessel's refrigeration equipment.  The ship's Officers shall ensure that the temperatures as directed in writing by Charterers are adhered to explicitly within the ordinary accepted practice applicable to the cargo being carried, and that the ventilation as installed is functioning as required by the Charterers.  In effect the Owners are responsible for the good condition and proper functioning of the refrigeration equipment as installed and in accordance with the instructions of the Charterers.  The refrigeration machinery and appliances shall always be under the supervision and control of a fully qualified refrigeration engineer.  The Officers are to be fully qualified, experienced and skilled in the handling and transportation of refrigerated cargoes.  All supplies that are necessary for the maintenance and operation of the refrigerated machinery are to be entirely for the Owners' account.

## CLAUSE 30 – DISTANCE THERMOMETERS

The Vessel is to be equipped with reading distance thermometers accessible in engine control room and CO2 detectors, which are to be maintained in good working order for the whole duration of this Charter.

4



RIDER CLAUSES FOR                                     2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

## CLAUSE 31 – SPEED AND CONSUMPTION

The Master shall before and during the sea voyages see to it that the Vessel is trimmed in
the most economical way in respect to speed and consumption and also otherwise
endeavor to achieve low running cost for the Vessel.  It is further agreed that no bunker
claims shall be made when extra bunkers consumed by reason of fouling caused by the
trading of the Vessel.

## CLAUSE 32 – ELECTRIC LIGHT

The Vessel to supply, as and when required, sufficient electric light and lamps at all
hatches and in all hold for night work.

## CLAUSE 33 – STEVEDORE DAMAGE

Should any damage, which affects Vessel's seaworthiness, be caused to the Vessel and
her fittings by the Charterers or their stevedores, the Master is to endeavor to obtain
written acknowledgement of the responsible party and have a survey made to define and
estimate the damage, in agreement with the ship's agent or supercargo (unless damage
should have been repaired in the meantime).  If Master is unable to arrange then he is to
immediately inform Charterers before leaving the port where damage occurred.

## CLAUSE 34 – BREAKDOWN OF WINCHES

In the event of a breakdown of shipboard cranes by reason of disablement of insufficient
power, the hire to be reduced pro rata for the period of such inefficiency in relation to the
number of hatches available.  Charter hire will not be reduced during the period a shore
appliance has been hired for Owners' account.  This clause is not valid if breakdown due
to the negligence of the stevedores.

## CLAUSE 35 – VESSEL'S CERTIFICATES

The Owners confirm that the Vessel has full certificates to operate within the trading
limits and warrant to maintain them for the duration of the Charter Party.

Vessel to have a valid Asian Gypsy Moth inspection certificate for the duration of this
voyage.



RIDER CLAUSES FOR                              2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

## CLAUSE 36 – INSURANCE PREMIUM

Charterers to have the benefit of any return of insurance premium receivable to Owners from Underwriters (as and when received from Underwriters) by reason of Vessel being in port for a minimum of 30 days provided Vessel is on hire.

## CLAUSE 37 – SUPERCARGO

The Charterers are to have the right to embark a supercargo on the Vessel, if the accommodation permits, the same not to be considered as a passenger, but to be treated as an Officer of the Vessel.  The Charterers are to pay U.S. Dollars $15 per day for victualling, excluding wines and spirits.  Any extra meals supplied on board on Charterers' request to be paid by Charterers at cost price, but not exceeding U.S. Dollars $10 per meal.

Should Charterers embark a supercargo, it is understood that Charterers relieve Owners from all responsibility for accident to such supercargo whilst on board and that any claim whatsoever will be settled by the Charterers.  Charterers' supercargo to sign standard letter of indemnity as required by Owners' P&I club.

## CLAUSE 38 – DETENTION/OFF-HIRE/PUT BACK

If upon the voyage speed be reduced by defect in or breakdown of any part of the Vessel's hull, machinery or equipment, the time so lost and the cost of any extra fuel consumed in consequence thereof and all extra expenses shall be deducted from hire.

Should the Vessel have to deviate (which expression includes putting back or putting into a port other than that to which she is bound under the instruction of Charterers) while on voyage by reason of an accident or breakdown, the hire shall be suspended from the time of deviating until such time as the vessel be again in an efficient state to resume her service where the accident occurred or at the same distance from the original destination, with all cargo and bunkers reloaded if any discharged.

This shall include deviation caused by sickness or by accident to crew or any person on board the Vessel (other than passengers or supercargo traveling under Charterers' auspices).  In addition, the fuel consumed and port charges, pilotage and all other expenses consequent upon putting into port shall be borne by the Owners.

The Owners are to be credited for any bunker savings as a result of any slow steaming specific to detention, off-hire and put back.

Any deductions from the hire are to be mutually agreed.



RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

2nd ORIGINAL

## CLAUSE 39 – CARGO

Cargo shall be loaded, stowed, tallied, trimmed and discharged by the Charterers at their risk and expense under Master's supervision. The Owner is not to be responsible for shortages, mixture of marks, nor for number of packages or pieces, nor for the damage or claims on cargo caused by bad stowage.

## CLAUSE 40 – TYPES OF CARGO

Frozen fish in cartons up to vessel's full capacity which is always to be non-injurious to vessel and/or vessel's insulation, under and on deck.

Charterers to have the liberty to load and carry in the Vessel, any lawful refrigerated or dry cargo not of a nature likely to be injurious to the Vessel's structure, decks, bins, gratings, insulation, etc.

## CLAUSE 41 – STOWAWAYS

(A)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercises of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter of the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the vessel be arrested as a result of the Charterers' breach of Charter according to sub clause (A)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(B)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

7



RIDER CLAUSES FOR                         2ⁿᵈ ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the good and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable, time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

## CLAUSE 42 – U.S. CUSTOMS ADVANCE NOTIFCATION/AMS CLAUSE FOR TIME CHARTER PARTIES

(A) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i)     Have in place a SCAC (Standard Carrier Alpha Code);
(ii)    Have in place a ICB (International Carrier Bond);
(iii)   Provide the Owners with a timely confirmation of (i) and (ii) above; and
(iv)    Submit a cargo declaration by AMS (Automated Manifest System) to US Customs and provide the Owners at the same time with a copy thereof.

(B) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs arising from the Charterers' failure to comply with any of the provisions of sub-clause (A).  Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(C) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(D) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## CLAUSE 43 – OWNERS' RESPONSIBILITY

Owners shall remain responsible for the navigation of the Vessel, her insurance, maintenance of the crew and all other matters of ship's husbandry.

8



RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

2nd ORIGINAL

## CLAUSE 44 – CLEANING OF HOLDS

(A) The Charterers may request the Owners to direct the crew to sweep and/or wash and/or clean the holds between voyages and/or between cargoes against payment at the rate of USD **$1,000** for sweeping and USD **$1,500** for washing, provided the crew is able safely to undertake such work and is allowed to do so by local regulations. In connection with any such operation the Owners shall not be responsible if the Vessel's holds are not accepted or passed. Time for cleaning shall be for the Charterers' account.

(B) All materials (including chemicals and detergents) required for cleaning of cargo holds shall be supplied and paid for by the Charterers.

(C) Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

The Charterers have the option of redelivering the vessel without cleaning holds against the lump sum payment of USD **$2,500** to the Owners.

The opening and closing of hatches where permitted are to be performed by the Vessel's crew.

On delivery vessel to be free from any smell and have clean holds.

## CLAUSE 45 – INSURANCE

P&I Club – British Marine
H&M Provider – Allianz
H&M Value - USD $ **7,000,000.00**

## CLAUSE 46 – WATCHMEN

Expenses for watchmen (gangway, etc.) ordered by the Master to be for Owners' account, unless watchmen are compulsory, in which case the expenses will be for Charterers' account.

## CLAUSE 47 – ON/HIRE SURVEY

Master's bunker figures to be used for delivery and redelivery purposes.

9



RIDER CLAUSES FOR                                    2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

Joint on-hire and off-hire surveys shall be conducted by mutually acceptable surveyors at ports or places agreed.  The on-hire survey shall be conducted without loss of time to the Charterers, whereas the off-hire survey shall be conducted in the Charterers time.  Survey fees and expenses shall be shared equally between the Owner and Charterers.


## CLAUSE 48 – CONTRABAND

The Owners of the vessel, their employees, crew and their agents, warrant that they have entered into a carriage initiative agreement with the US Customs and are in compliance with the terms of the said agreement and with the provisions of the US anti-Drug Act of 1986 (and any amendment thereto) and will exercise the highest degree of care and diligence to ensure no illicit drugs, contraband, or unmanifested, illegal, or mis-described cargo is allowed on or carried on the vessel.

Charterers shall be responsible for fines arising out of the carriage of illegal cargo where Charterers have directly caused the carriage of such illegal cargo. Owners shall be responsible for any fines arising out of the smuggling of drugs by Owners, Officers or Crew.

In this regard any watchmen/divers ordered by Charterers and paid for by their agents to be shared equally by Charterers and Owners.

The Charterers are to be responsible for their employees, servants and/or agents with respect to this clause.


## CLAUSE 49 – BILLS OF LADING

Charterers or their agents are authorized to sign Bills of Lading on behalf of Master in accordance with loading tally mate's receipts, etc.  The Vessel shall not perform an outturn tally unless specifically requested by the Charterers.  Any tally will be performed as a service to the Charterers and the terms of such will be agreed between the Owners and Charterers.

## CLAUSE 50 – BUNKER CLAUSE

The Vessel is to be delivered with bunkers onboard and Charterers to redeliver with about same quantities.  Any minor difference to be settled at mean Platts price applicable at the port of redelivery at time of redelivery or closest thereto.  In the case that there is no Platts price quoted for the port of redelivery, the Platts average price at the nearest port quoted by Platts to apply.

RIDER CLAUSES FOR                                    2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

## CLAUSE 51 – INCLUDED CLAUSES AND GENERAL AVERAGE

(A) The New Jason and the Both-to-Blame Collision Clause, as attached, are deemed to form part of this Charter Party. All conditions in this Charter Party which conflict with these clauses are to be void to the extent of such conflict.

(B) The New Jason, and Both-to-Blame Collision Clause and the appropriate of the following clauses paramount are to be incorporated directly or implication in all Bills of Lading issued under this Charter Party.

1. Canadian Clause Paramount in respect of shipments to and from the USA.

2. USA Clause Paramount in respect of shipments to and from the USA.

3. In all other instances Bills of Lading issued under this Charter Party shall give effect to the Hague-Visby Rules applicable in the circumstances.

## CLAUSE 52 – GOVERNING TIME

The delivery and redelivery times should be based on GMT.

## CLAUSE 53 – HOUSE FLAG & FUNNEL

Not applicable.

## CLAUSE 54 – CONFIDENTIALITY

This fixture is to be kept private and confidential.

## CLAUSE 55 – OWNERS AGENCY SERVICES

The Owners may appoint their own agent for any crewing matters and/or husbandry items. Owners are free to appoint Charterers agent for these matters free of any additional fee and any costs or disbursements to be handled directly by Owners with Charterers agent.



RIDER CLAUSES FOR            2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

### CLAUSE 56 – CONTAINERS ON DECK

Charterers are at liberty to carry containers within the physical safety constraints of the Vessel and her fittings and always in accordance with the Master's instructions.

Owners accept no responsibility for loss or damage to equipment or cargo carried in integral refrigerated containers carried on deck caused by any malfunction, failure or breakdown of the container refrigeration machinery whether mechanical or electrical or whether caused by failure of gas supply or fault or error in the temperature recording system. Charterers hereby indemnify and hold harmless the Owners against all claims and consequences arising from the above.

Charterers shall ensure that any containers provided are compatible with the ship's power supply and are fitted with plugs compatible with the ship's power sockets. Charterers are to provide the ship with adequate spare parts and documentation (maintenance and repair manuals) and refrigeration gas and lubricating oil for the duration of the intended voyage. Owners, however, accept no responsibility where repairs cannot be effected due to faulty workmanship of the crew or due to lack of spare parts or refrigeration gas.

All Bills of Lading issued under this Charter Party for cargo carried on deck in containers to be clearly endorsed "SHIPPED ON DECK AT SHIPPERS'/RECEIVERS' RISK AND EXPENSE".

In case of failure to comply with this provision, Charterers herby affirm that they will hold harmless and indemnify the Vessel, her Owners, managers, operators, agents and crew. In respect of any and all liability, loss or damage whatsoever, including all costs, expenses and legal fees, which any of the aforementioned parties may sustain by reason of any claimant alleging said carriage is a deviation and/or in violation of the terms of the applicable contract of carriage and/or COGSA, or any similar legislation.

### CLAUSE 57 – VESSEL MANNING

The Owners of the Vessel undertake that the minimum terms and conditions of employment of the crew of the Vessel are now or will be prior to delivery of the Vessel into this Time Charter, and will remain so for the period of this charter, covered by Bona Fide Trade Union Agreement.

### CLAUSE 58 – MISCELLANEOUS VOYAGE EXPENSES

Charterers shall pay to Owners together with hire the amount of USD **$1,500** per calendar month for communication and representation.

12



<div align="center">

**RIDER CLAUSES FOR**       **2nd ORIGINAL**
**CHARTER PARTY 15 MARCH 2013**
**MARBELLA CARRIER**

</div>

## CLAUSE 59 – EXTRA INSURANCE

Extra insurance as per Box 17.

## CLAUSE 60 – GOVERNING LAW

This Charter Party is to be construed by and in accordance with English Law with jurisdiction in London.

## CLAUSE 61 – FUEL SULPHUR CONTENT CLAUSE

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 MARPOL Annex VI, including the Guidelines in respect of sampling and the provisions of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (A).

(B) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (A), the Owners warrant that:

    (i)    The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

    (ii)    The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 Annex VI.

(C) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

<div align="center">13</div>

2nd ORIGINAL

RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

## CLAUSE 62 – WEATHER ROUTING

(A) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to belief that such a route will compromise the safe navigation of the Vessel.

(B) In the event the Charterers supply the Master with weather routing information, although not obliged to follow such routing information, the Master shall comply with the reporting procedure of that service.

## CLAUSE 63 – ISPS CLAUSE FOR TIME CHARTERS

(A)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and the "the Company" (as defined by the ISPS Code).  If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements to the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request, the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(B)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.  Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master.  Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners."

14

RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

2nd ORIGINAL

(ii) Loss, damages, expenses or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(C) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(D) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## CLAUSE 64 – OWNERS' BANK DETAILS AND NON-PAYMENT OF HIRE

BANKING DETAILS –

In US Dollars To :
Bank :                    **Bank of America**
New York, NY
ABA:
Swift code:
Acount number:
FAVOUR OF:                Network Shipping Ltd.

NON-PAYMENT OF HIRE -

(A) The Owners shall notify the Charterers in writing if hire payment is overdue.  If the payment is note received by the Owners within **three** days, the Owners may withdraw the Vessel.  Such right of withdrawal shall be without prejudice to any other rights that the Owner may have under this Charter Party.

(B) The Charterers shall indemnify the Owners in respect of any liabilities incurred by the Owners under the Bill of Lading or any other contracts of carriage as a consequence of the Owners' suspension of and/or withdrawal from any or all of their obligations under this Charter Party.

(C) If, notwithstanding any to the contrary in this Clause, the Owners choose not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of hire or a serious of late payments of hire, this shall not be construed as a

15



RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

2nd ORIGINAL

waiver of their right to withdraw the Vessel under sub-clause (B) in respect of any subsequent late payment under this Charter Party.

## CLAUSE 65 – WAR RISKS

(A) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(B) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(C) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(D)(i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such

<div align="center">

**RIDER CLAUSES FOR**       2nd **ORIGINAL**
**CHARTER PARTY 15 MARCH 2013**
**MARBELLA CARRIER**

</div>

Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(E) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(F) The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(G) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port of such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

<div align="center">

17

</div>

RIDER CLAUSES FOR
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

2nd ORIGINAL

(H) If in compliance with any of the provisions of sub-clauses (B) to (G) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

## CLAUSE 66 – ICE CLAUSE

Not applicable.

## CLAUSE 67 – BALLAST BONUS

Not applicable.

## CLAUSE 68 – BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship come into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by other on-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## CLAUSE 69 – GENERAL AVERAGE AND THE NEW JASON CLAUSE

General average shall be payable in London according to the York/Antwerp Rules, 1994, where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

RIDER CLAUSES FOR                          2nd ORIGINAL
CHARTER PARTY 15 MARCH 2013
MARBELLA CARRIER

**NEW JASON CLAUSE**

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully if the said salving ship or ships belonged to strangers.

Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

And the Charterers shall procure that Bills of Lading issued under this Charter Party shall contain same clause.



# EXHIBIT B

B

# BIMCO UNIFORM TIME-CHARTER (AS REVISED 2001) CODE NAME: "BALTIME 1939"

PART I

| | |
|---|---|
| 1. Shipbroker<br>Ocean Reefer Services Limited<br>Orpington<br>Kent<br>UK | 2. Place and date of Charter<br>Orpington, 15th March 2013 |
| 3. Owners/Place of business<br>Network Shipping Limited<br>241 Sevilla Ave, Coral Gables<br>Florida, USA | 4. Charterers/Place of business<br>Alaska Reefer Management LLC<br>Seattle, USA |
| 5. Vessel's Name<br>Murcia Carrier | 6. GT/NT<br>See Clause 26 |
| 7. Class<br>See Clause 26 | 8. Indicated brake horse power (bhp)<br>Sea Clause 26 |
| 9. Total tons d. w. (abt.) on summer freeboard<br>See Clause 26 | 10. Cubic feet grain/bale capacity<br>See Clause 26 |
| 11. Permanent bunkers (abt.) | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of<br>See Clause 26 |
| 13. Present position<br>Trading | 14. Period of hire (Cl. 1)<br>One TC trip via GSP GS berths always within IWL/INL ice free AAAA from Alaska to Continent range duration about 50-60 days WOG. |
| 15. Port of delivery (Cl. 1)<br>APS 1SP Hong Kong | 16. Time of delivery (Cl. 1)<br>23rd – 25th March 2013. |

17. (a) Trade limits (Cl. 2)
Trade worldwide within IWL, excluding Cuba as long as current embargo prevails, UN embargoed countries and/or war like areas including Iran/Libya/TOC/Israel/Syria. Extra insurance for war risk and/or piracy areas to be arranged by Owners and additional premium cost on Charterers account.

(b) Cargo exclusions specially agreed
Frozen fish in cartons up to vessel's full capacity which is always to be non-injurious to vessel and/or vessel's insulation, under/on decks.
No Open Sea trans-shipment operations.
Arms, ammunition, pitch, asphalt, chemicals, nuclear fuels/waste, radioactives, hides, all inflamables – injurious-hazardous goods as per IMO Code are further excluded. Also livestock and explosives.

| | |
|---|---|
| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5)<br>See Clause 50. | 19. Charter hire (Cl. 6)<br>US$ 10,000.00 per day including overtime. |

20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6)
US Dollars, 30 days in advance to Owners' nominated bank account as per Clause 64.

| | |
|---|---|
| 21. Place or range of re-delivery (Cl. 7)<br>DOP 1SP Continent (Havre-Hamburg range) including SCUK in CHOPT | 22. Cancelling date (Cl. 21)<br>2400hrs 25th March 2013 |
| 23. Dispute resolution (state 22(A), 22(B) or 22(C); if 22(C) agreed Place of Arbitration must be stated) (Cl. 22)<br>London See Clause 22A | 24. Brokerage commission and to whom payable (Cl. 24)<br>2.5pct address commission plus 1.25pct to Ocean Reefer Services Limited |

25. Numbers of additional clauses covering special provisions, if agreed
Clauses 26 to 67.

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | ALASKA REEFER<br>Alaska Reefer Management LLC<br>2025 First Avenue, Suite 900<br>Seattle, WA 98121 |

ORIGINAL

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen    Printed by BIMCO's idea    Issued 1909; Amended 1911; 1912; 1920; 1939; 1950; 1974; and 2001

## PART II
### "BALTIME 1939" Uniform Time-Charter (as revised 2001)

It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 5 of the gross/net tonnage indicated in Box 6, classed as stated in Box 7 and of indicated brake horse power (bhp) as stated in Box 8, carrying about the number of tons deadweight indicated in Box 9 on summer freeboard inclusive of bunkers, stores and provisions, having as per builder's plan a cubic-feet grain/bale capacity as stated in Box 10, exclusive of permanent bunkers, which contain about the number of tons stated in Box 11, and fully loaded capable of steaming about the number of knots indicated in Box 12 in good weather and smooth water on a consumption of about the number of tons fuel oil stated in Box 12, now in position as stated in Box 13 and the party mentioned as Charterers in Box 4, as follows:  [1–15]

**1. Period/Port of Delivery/Time of Delivery**
The Owners let, and the Charterers hire the Vessel for a period of the number of calendar months indicated in Box 14 from the time ~~(not a Sunday or a legal Holiday unless taken over)~~ the Vessel is delivered and placed at the disposal of the Charterers ~~between 9 a.m. and 6 p.m., or between 9 a.m. and 2 p.m. if on Saturday,~~ at the port stated in Box 15 in such available berth where she can safely lie always afloat, as the Charterers may direct, the Vessel being in every way fitted for ~~ordinary~~ frozen fish cargo service. The Vessel shall be delivered at the time indicated in Box 16.  [16–27]

**2. Trade**
The Vessel shall be employed in lawful trades for the carriage of lawful merchandise only between safe ports or places where the Vessel can safely lie always afloat within the limits stated in Box 17. No live stock nor injurious, inflammable or dangerous goods (such as acids, explosives, calcium carbide, ferro silicon, naphtha, motor spirit, tar, or any of their products) shall be shipped.  [28–36]

**3. Owners' Obligations**
The Owners shall provide and pay for all provisions and Wages, for insurance of the Vessel, for all deck and Engine-room stores and maintain her in a thoroughly efficient state in hull and machinery during service. The Owners shall provide winchmen from the crew to operate the Vessel's cargo handling gear, unless the crew's employment conditions or local union or port regulations prohibit this, in which case qualified shore-winchmen shall be provided and paid for by the Charterers.  [37–47]

**4. Charterers' Obligations**
The Charterers shall provide and pay for all fuel oil, port charges, pilotages (whether compulsory or not), canal steersmen, boatage, lights, tug-assistance, consular charges (except those pertaining to the Master, officers and crew), canal, dock and other dues and charges, including any foreign general municipality or state taxes, also all dock, harbour and tonnage dues at the ports of delivery and re-delivery (unless incurred through cargo carried before delivery or after re-delivery), agencies, commissions, also shall arrange and pay for loading, trimming, stowing (including dunnage and shifting boards, excepting any already on board), unloading, weighing, tallying and delivery of cargoes, surveys on hatches, meals supplied to officials and men in their service and all other charges and expenses whatsoever including detention and expenses through quarantine (including cost of fumigation and disinfection). All ropes, slings and special runners actually used for loading  [48–66]

and discharging and any special gear, including special ropes and chains required by the custom of the port for mooring shall be for the Charterers' account. The Vessel shall be fitted with winches, derricks, wheels and ordinary runners capable of handling lifts ~~up to 2 tons as per~~ **vessel's description**.  [67–71]

**5. Bunkers See Clause 50**
~~The Charterers at port of delivery and the Owners at port of re-delivery shall take over and pay for all fuel oil remaining in the Vessel's bunkers at current price at the respective ports. The Vessel shall be re-delivered with not less than the number of tons and not exceeding the number of tons of fuel oil in the Vessel's bunkers stated in Box 18.~~  [72–79]

**6. Hire**
The Charterers shall pay as hire the rate stated in Box 19 per 30 days, commencing in accordance with Clause 1 until her re-delivery to the Owners.
Payment of hire shall be made in cash, in the currency stated in Box 20, without discount, every 30 days, in advance, and in the manner prescribed in Box 20. In default of payment the Owners shall have the right of withdrawing the Vessel from the service of the Charterers, without noting any protest and without interference by any court or any other formality whatsoever and without prejudice to any claim the Owners may otherwise have on the Charterers under the Charter.  [80–92]

**7. Re-delivery**
The Vessel shall be re-delivered on the expiration of the Charter in the same good order as when delivered to the Charterers (fair wear and tear excepted) at an ice-free port in the Charterers' option at the place or within the range stated in Box 21, ~~between 9 a.m. and 6 p.m., and 9 a.m. and 2 p.m. on Saturday, but the day of re-delivery shall not be a Sunday or legal Holiday.~~
The Charterers shall give the Owners not less than **fifteen** ~~and ten~~
days' notice **and 5,3,1 days precise notice** at which port and on about which day the
Vessel will be re-delivered. Should the Vessel be ordered on a voyage by which the Charter period will be exceeded the Charterers shall have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow redelivery about the time fixed for the termination of the Charter, but for any time exceeding the termination date the Charterers shall pay the market rate if higher than the rate stipulated herein.  [93–111]

**8. Cargo Space**
The whole reach and burthen of the Vessel, including lawful deck-capacity shall be at the Charterers' disposal, reserving proper and sufficient space for the Vessel's Master, officers, crew, tackle, apparel, furniture, provisions and stores.  [112–117]

**9. Master**
The Master shall prosecute all voyages with the utmost despatch and shall render customary assistance with the Vessel's crew. The Master shall be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers shall indemnify the Owners against all consequences or liabilities arising from the Master, officers or Agents signing Bills of Lading or other documents or otherwise complying with such orders, as well as from any irregularity in the Vessel's papers or for overcarrying goods. The Owners shall not be responsible for shortage, mixture, marks, nor for Number of pieces or packages, nor for damage to or claims on cargo caused by bad stowage or otherwise. If  [118–131]

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense

## PART II
### "BALTIME 1939" Uniform Time-Charter (as revised 2001)

the Charterers have reason to be dissatisfied with the | 132
conduct of the Master or any officer, the Owners, on | 133
receiving particulars of the complaint, promptly to | 134
investigate the matter, and, if necessary and practicable, | 135
to make a change in the appointments. | 136

**10. Directions and Logs** | 137
The Charterers shall furnish the Master with all | 138
instructions and sailing directions and the Master shall | 139
keep full and correct logs accessible to the Charterers | 140
or their Agents. | 141

**11. Suspension of Hire etc.** | 142
(A) In the event of drydocking or other necessary | 143
measures to maintain the efficiency of the Vessel, | 144
deficiency of men or Owners' stores, breakdown of | 145
machinery, damage to hull or other accident, either | 146
hindering or preventing the working of the Vessel and | 147
continuing for more than ~~twenty-four~~ 12 consecutive hours, | 148
no hire shall be paid in respect of any time lost thereby | 149
during the period in which the Vessel is unable to perform | 150
the service immediately required. Any hire paid in | 151
advance shall be adjusted accordingly. | 152
(B) In the event of the Vessel being driven into port or to | 153
anchorage through stress of weather, trading to shallow | 154
harbours or to rivers or ports with bars or suffering an | 155
accident to her cargo, any detention of the Vessel and/or | 156
expenses resulting from such detention shall be for the | 157
Charterers' account even if such detention and/or | 158
expenses, or the cause by reason of which either is | 159
incurred, be due to, or be contributed to by, the | 160
negligence of the Owners' servants. | 161

**12. Responsibility and Exemption** | 162
The Owners only shall be responsible for delay in | 163
delivery of the Vessel or for delay during the currency of | 164
the Charter and for loss or damage to goods onboard, if | 165
such delay or loss has been caused by want of due | 166
diligence on the part of the Owners or their Manager in | 167
making the Vessel seaworthy and fitted for the voyage | 168
or any other personal act or omission or default of the | 169
Owners or their Manager. The Owners shall not be | 170
responsible in any other case nor for damage or delay | 171
whatsoever and howsoever caused even if caused by | 172
the neglect or default of their servants. The Owners shall | 173
not be liable for loss or damage arising or resulting | 174
from strikes, lock-outs or stoppage or restraint of labour | 175
(including the Master, officers or crew) whether partial | 176
or general. The Charterers shall be responsible for loss | 177
or damage caused to the Vessel or to the Owners by | 178
goods being loaded contrary to the terms of the Charter | 179
or by improper or careless bunkering or loading, stowing | 180
or discharging of goods or any other improper or | 181
negligent act on their part or that of their servants. | 182

**13. Advances** | 184
The Charterers or their Agents shall advance to the | 185
Master, if required, necessary funds for ordinary | 186
disbursements for the Vessel's account at any port | 187
charging only interest at 6 2.5 per cent. p.a., such advances | 188
shall be deducted from hire. | 189

**14. Excluded Ports** | 190
The Vessel shall not be ordered to nor bound to enter: | 191
(A) any place where fever or epidemics are prevalent or | 192
to which the Master, officers and crew by law are not | 193
bound to follow the Vessel; | 194
(B) any ice-bound place or any place where lights, | 195
lightships, marks and buoys are or are likely to be | 196
withdrawn by reason of ice on the Vessel's arrival or | 197
where there is risk that ordinarily the Vessel will not be | 198
able on account of ice to reach the place or to get out |

after having completed loading or discharging. The | 199
Vessel shall not be obliged to force ice. If on account of | 200
ice the Master considers it dangerous to remain at the | 201
loading or discharging place for fear of the Vessel being | 202
frozen in and/or damaged, he has liberty to sail to a | 203
convenient open place and await the Charterers' fresh | 204
instructions. Unforeseen detention through any of above | 205
causes shall be for the Charterers' account. | 206

**15. Loss of Vessel** | 207
Should the Vessel be lost or missing, hire shall cease | 208
from the date when she was lost. If the date of loss | 209
cannot be ascertained half hire shall be paid from the | 210
date the Vessel was last reported until the calculated | 211
date of arrival at the destination. Any hire paid in advance | 212
shall be adjusted accordingly. | 213

**16. Overtime** | 214
~~The Vessel shall work day and night if required. The~~ | 215
~~Charterers shall refund the Owners their outlays for all~~ | 216
~~overtime paid to officers and crew according to the hours~~ | 217
~~and rates stated in the Vessel's articles.~~ | 218

**17. Lien** | 219
The Owners shall have a lien upon all cargoes and | 220
sub-freights belonging to the Time-Charterers and any | 221
Bill of Lading freight for all claims under this Charter, | 222
and the Charterers shall have a lien on the Vessel for all | 223
moneys paid in advance and not earned. | 224

**18. Salvage** | 225
All salvage and assistance to other vessels shall be for | 226
the Owners' and the Charterers' equal benefit after | 227
deducting the Master's, officers' and crew's proportion | 228
and all legal and other expenses including hire paid | 229
under the charter for time lost in the salvage, also repairs | 230
of damage and fuel oil consumed. The Charterers shall | 231
be bound by all measures taken by the Owners in order | 232
to secure payment of salvage and to fix its amount. | 233

**19. Sublet** | 234
The Charterers shall have the option of subletting the | 235
Vessel, giving due notice to the Owners, but the original | 236
Charterers shall always remain responsible to the | 237
Owners for due performance of the Charter. | 238

**20. War ("Conwartime 1993")** See Clause 65 | 239
~~(A)  For the purpose of this Clause, the words:~~ | 240
~~(i)  "Owners" shall include the shipowners, bareboat~~ | 241
~~charterers, disponent owners, managers or other~~ | 242
~~operators who are charged with the management of the~~ | 243
~~Vessel, and the Master; and~~ | 244
~~(ii)  "War Risks" shall include any war (whether actual or~~ | 245
~~threatened), act of war, civil war, hostilities, revolution,~~ | 246
~~rebellion, civil commotion, warlike operations, the laying~~ | 247
~~of mines (whether actual or reported), acts of piracy,~~ | 248
~~acts of terrorists, acts of hostility or malicious damage,~~ | 249
~~blockades (whether imposed against all vessels or~~ | 250
~~imposed selectively against vessels of certain flags or~~ | 251
~~ownership, or against certain cargoes or crews or~~ | 252
~~otherwise howsoever), by any person, body, terrorist or~~ | 253
~~political group, or the Government of any state~~ | 254
~~whatsoever, which, in the reasonable judgement of the~~ | 255
~~Master and/or the Owners, may be dangerous or are~~ | 256
~~likely to be or to become dangerous to the Vessel, her~~ | 257
~~cargo, crew or other persons on board the Vessel.~~ | 258
~~(B)  The Vessel, unless the written consent of the Owners~~ | 259
~~be first obtained, shall not be ordered to or required to~~ | 260
~~continue to or through, any port, place, area or zone~~ | 261
~~(whether of land or sea), or any waterway or canal, where~~ | 262
~~it appears that the Vessel, her cargo, crew or other~~ | 263
~~persons on board the Vessel, in the reasonable~~ | 264

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense

## PART II
### "BALTIME 1939" Uniform Time-Charter (as revised 2001)

~~judgement of the Master and/or the Owners, may be, or~~ 265
~~are likely to be, exposed to War Risks. Should the Vessel~~ 266
~~be within any such place as aforesaid, which only~~ 267
~~becomes dangerous, or is likely to be or to become~~ 268
~~dangerous, after her entry into it, she shall be at liberty~~ 269
~~to leave it.~~ 270
~~(C) The Vessel shall not be required to load contraband~~ 271
~~cargo, or to pass through any blockade, whether such~~ 272
~~blockade be imposed on all vessels, or is imposed~~ 273
~~selectively in any way whatsoever against vessels of~~ 274
~~certain flags or ownership, or against certain cargoes~~ 275
~~or crew or otherwise howsoever, or to proceed to an~~ 276
~~area where she shall be subject, or is likely to be subject~~ 277
~~to a belligerent's right of search and/or confiscation.~~ 278
~~(D) (i) The Owners may effect war risks insurance in~~ 279
~~respect of the Hull and Machinery of the Vessel and their~~ 280
~~other interests (including, but not limited to, loss of~~ 281
~~earnings and detention, the crew and their Protection~~ 282
~~and Indemnity Risks), and the premiums and/or calls~~ 283
~~therefor shall be for their account.~~ 284
~~(ii) If the Underwriters of such insurance should require~~ 285
~~payment of premiums and/or calls because, pursuant~~ 286
~~to the Charterers' orders, the Vessel is within, or is due~~ 287
~~to enter and remain within, any area or areas which are~~ 288
~~specified by such Underwriters as being subject to~~ 289
~~additional premiums because of War Risks, then such~~ 290
~~premiums and/or calls shall be reimbursed by the~~ 291
~~Charterers to the Owners at the same time as the next~~ 292
~~payment of hire is due.~~ 293
~~(E) If the Owners become liable under the terms of~~ 294
~~employment to pay to the crew any bonus or additional~~ 295
~~wages in respect of sailing into an area which is~~ 296
~~dangerous in the manner defined by the said terms,~~ 297
~~then such bonus or additional wages shall be re-~~ 298
~~imbursed to the Owners by the Charterers at the same~~ 299
~~time as the next payment of hire is due.~~ 300
~~(F) The Vessel shall have liberty:-~~ 301
~~(i) to comply with all orders, directions, recom-~~ 302
~~mendations or advice as to departure, arrival, routes,~~ 303
~~sailing in convoy, ports of call, stoppages, destinations,~~ 304
~~discharge of cargo, delivery, or in any other way~~ 305
~~whatsoever, which are given by the Government of the~~ 306
~~Nation under whose flag the Vessel sails, or other~~ 307
~~Government to whose laws the Owners are subject, or~~ 308
~~any other Government, body or group whatsoever acting~~ 309
~~with the power to compel compliance with their orders~~ 310
~~or directions;~~ 311
~~(ii) to comply with the order, directions or recom-~~ 312
~~mendations of any war risks underwriters who have the~~ 313
~~authority to give the same under the terms of the war~~ 314
~~risks insurance;~~ 315
~~(iii) to comply with the terms of any resolution of the~~ 316
~~Security Council of the United Nations, any directives of~~ 317
~~the European Community, the effective orders of any~~ 318
~~other Supranational body which has the right to issue~~ 319
~~and give the same, and with national law is aimed at~~ 320
~~enforcing the same to which the Owners are subject,~~ 321
~~and to obey the orders and directions of those who are~~ 322
~~charged with their enforcement;~~ 323
~~(iv) to divert and discharge at any other port any cargo or~~ 324
~~part thereof which may render the Vessel liable to~~ 325
~~confiscation as a contraband carrier;~~ 326
~~(v) to divert and call at any other port to change the crew~~ 327
~~or any part thereof or other persons on board the Vessel~~ 328
~~when there is reason to believe that they may be subject~~ 329
~~to internment, imprisonment or other sanctions.~~ 330
~~(G) If in accordance with their rights under the foregoing~~ 331
~~provisions of this Clause, the Owners shall refuse to~~ 332
~~proceed to the loading or discharging ports, or any one~~ 333

~~or more of them, they shall immediately inform the~~ 334
~~Charterers. No cargo shall be discharged at any~~ 335
~~alternative port without first giving the Charterers notice~~ 336
~~of the Owners' intention to do so and requesting them~~ 337
~~to nominate a safe port for such discharge. Failing such~~ 338
~~nomination by the Charterers within 48 hours of the~~ 339
~~receipt of such notice and request, the Owners may~~ 340
~~discharge the cargo at any safe port of their own choice.~~ 341
~~(H) If in compliance with any of the provisions of sub-~~ 342
~~clauses (B) to (G) of this Clause anything is done or not~~ 343
~~done, such shall not be deemed as a deviation, but shall~~ 344
~~be considered as due fulfilment of this Charter.~~ 345

### 21. Cancelling
346
Should the Vessel not be delivered by the date indicated 347
in Box 22, the Charterers shall have the option of 348
cancelling. If the Vessel cannot be delivered by the 349
cancelling date, the Charterers, if required, shall declare 350
within 48 hours after receiving notice thereof whether 351
they cancel or will take delivery of the Vessel. 352

### 22. Dispute Resolution
353
*) (A) This Charter shall be governed by and construed in 354
accordance with English law and any dispute arising 355
out of or in connection with this Charter shall be referred 356
to arbitration in London in accordance with the Arbitration 357
Act 1996 or any statutory modification or re-enactment 358
thereof save to the extent necessary to give effect to the 359
provisions of this Clause. 360
The arbitration shall be conducted in accordance with 361
the London Maritime Arbitrators Association (LMAA) 362
Terms current at the time when the arbitration 363
proceedings are commenced. 364
The reference shall be to three arbitrators. A party 365
wishing to refer a dispute to arbitration shall appoint its 366
arbitrator and send notice of such appointment in writing 367
to the other party requiring the other party to appoint its 368
own arbitrator within 14 calendar days of that notice and 369
stating that it will appoint its arbitrator as sole arbitrator 370
unless the other party appoints its own arbitrator and 371
gives notice that it has done so within the 14 days 372
specified. If the other party does not appoint its own 373
arbitrator and give notice that it has done so within the 374
14 days specified, the party referring a dispute to 375
arbitration may, without the requirement of any further 376
prior notice to the other party, appoint its arbitrator as 377
sole arbitrator and shall advise the other party 378
accordingly. The award of a sole arbitrator shall be 379
binding on both parties as if he had been appointed by 380
agreement. 381
Nothing herein shall prevent the parties agreeing in 382
writing to vary these provisions to provide for the 383
appointment of a sole arbitrator. 384
In cases where neither the claim nor any counterclaim 385
exceeds the sum of US$50,000 (or such other sum as 386
the parties may agree) the arbitration shall be conducted 387
in accordance with the LMAA Small Claims Procedure 388
current at the time when the arbitration proceedings are 389
commenced. 390
*) ~~(B) This Charter shall be governed by and construed in~~ 391
~~accordance with Title 9 of the United States Code and~~ 392
~~the Maritime Law of the United States and any dispute~~ 393
~~arising out of or in connection with this Contract shall~~ 394
~~be referred to three persons at New York, one to be~~ 395
~~appointed by each of the parties hereto, and the third by~~ 396
~~the two so chosen; their decision or that of any two of~~ 397
~~them shall be final, and for the purposes of enforcing~~ 398
~~any award, judgement may be entered on an award by~~ 399
~~any court of competent jurisdiction. The proceedings~~ 400
~~shall be conducted in accordance with the rules of the~~ 401

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense

## PART II
## "BALTIME 1939" Uniform Time-Charter (as revised 2001)

~~Society of Maritime Arbitrators, Inc.~~ 402
~~In cases where neither the claim nor any counterclaim~~ 403
~~exceeds the sum of US$50,000 (or such other sum as~~ 404
~~the parties may agree) the arbitration shall be conducted~~ 405
~~in accordance with the Shortened Arbitration Procedure~~ 406
~~of the Society of Maritime Arbitrators, Inc. current at the~~ 407
~~time when the arbitration proceedings are commenced.~~ 408
~~(C) This Charter shall be governed by and construed in~~ 409
~~accordance with the law of the place mutually agreed~~ 410
~~by the parties and any dispute arising out of or in~~ 411
~~connection with this Charter shall be referred to~~ 412
~~arbitration at a mutually agreed place, subject to the~~ 413
~~procedures applicable there.~~ 414
~~(D) Notwithstanding (A), (B) or (C) above, the parties~~ 415
~~may agree at any time to refer to mediation any difference~~ 416
~~and/or dispute arising out of or in connection with this~~ 417
~~Charter.~~ 418
~~In the case of a dispute in respect of which arbitration~~ 419
~~has been commenced under (A), (B) or (C) above, the~~ 420
~~following shall apply:-~~ 421
~~(i) Either party may at any time and from time to time~~ 422
~~elect to refer the dispute or part of the dispute to~~ 423
~~mediation by service on the other party of a written notice~~ 424
~~(the "Mediation Notice") calling on the other party to agree~~ 425
~~to mediation.~~ 426
~~(ii) The other party shall thereupon within 14 calendar~~ 427
~~days of receipt of the Mediation Notice confirm that they~~ 428
~~agree to mediation, in which case the parties shall~~ 429
~~thereafter agree a mediator within a further 14 calendar~~ 430
~~days, failing which on the application of either party a~~ 431
~~mediator will be appointed promptly by the Arbitration~~ 432
~~Tribunal ("the Tribunal") or such person as the Tribunal~~ 433
~~may designate for that purpose. The mediation shall~~ 434
~~be conducted in such place and in accordance with such~~ 435
~~procedure and on such terms as the parties may agree~~ 436
~~or, in the event of disagreement, as may be set by the~~ 437
~~mediator.~~ 438
~~(iii) If the other party does not agree to mediate, that fact~~ 439
~~may be brought to the attention of the Tribunal and may~~ 440
~~be taken into account by the Tribunal when allocating~~ 441
~~the costs of the arbitration as between the parties.~~ 442
~~(iv) The mediation shall not affect the right of either party~~ 443

~~to seek such relief or take such steps as it considers~~ 444
~~necessary to protect its interest.~~ 445
~~(v) Either party may advise the Tribunal that they have~~ 446
~~agreed to mediation. The arbitration procedure shall~~ 447
~~continue during the conduct of the mediation but the~~ 448
~~Tribunal may take the mediation timetable into account~~ 449
~~when setting the timetable for steps in the arbitration.~~ 450
~~(vi) Unless otherwise agreed or specified in the~~ 451
~~mediation terms, each party shall bear its own costs~~ 452
~~incurred in the mediation and the parties shall share~~ 453
~~equally the mediator's costs and expenses.~~ 454
~~(vii) The mediation process shall be without prejudice~~ 455
~~and confidential and no information or documents~~ 456
~~disclosed during it shall be revealed to the Tribunal~~ 457
~~except to the extent that they are disclosable under the~~ 458
~~law and procedure governing the arbitration.~~ 459
~~(Note: The parties should be aware that the mediation~~ 460
~~process may not necessarily interrupt time limts.)~~ 461
~~(E) If Box 23 in Part I is not appropriately filled in, sub-~~ 462
~~clause (A) of this Clause shall apply. Sub-clause (D)~~ 463
~~shall apply in all cases.~~ 464
* ~~(A), (B) and (C) are alternatives; indicate alternative~~ 465
  ~~agreed in Box 23.~~ 466

**23. General Average** 467
General Average shall be settled according to York/ 468
Antwerp Rules, 1994 and any subsequent modification 469
thereof. Hire shall not contribute to General Average. 470

**24. Commission** 471
The Owners shall pay a commission at the rate stated 472
in Box 24 to the party mentioned in Box 24 on any hire 473
paid under the Charter, but in no case less than is 474
necessary to cover the actual expenses of the Brokers 475
and a reasonable fee for their work. If the full hire is not 476
paid owing to breach of Charter by either of the parties 477
the party liable therefor shall indemnify the Brokers 478
against their loss of commission. Should the parties 479
agree to cancel the Charter, the Owners shall indemnify 480
the Brokers against any loss of commission but in such 481
case the commission not to exceed the brokerage 482
on one year's hire. 483

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

RIDER CLAUSES FOR                      2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

CLAUSE 26   VESSEL DESCRIPTION

CLAUSE 27   GRATINGS

CLAUSE 28   REFRIGERATION MACHINERY

CLAUSE 29   REFRIGERATION

CLAUSE 30   DISTANCE THERMOMETERS

CLAUSE 31   SPEED AND CONSUMPTION

CLAUSE 32   ELECTRIC LIGHT

CLAUSE 33   STEVEDORE DAMAGE

CLAUSE 34   BREAKDOWN OF WINCHES

CLAUSE 35   VESSEL CERTIFICATES

CLAUSE 36   INSURANCE PREMIUM

CLAUSE 37   SUPERCARGO

CLAUSE 38   DETENTION/OFF-HIRE/PUT BACK

CLAUSE 39   CARGO

CLAUSE 40   TYPES OF CARGO

CLAUSE 41   STOWAWAYS

CLAUSE 42   U.S. CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE
            FOR TIME CHARTER PARTIES/EU CARGO DECLARATION

CLAUSE 43   OWNERS' RESPONSIBILITY

CLAUSE 44   CLEANING OF HOLDS

CLAUSE 45   INSURANCE

CLAUSE 46   WATCHMEN

CLAUSE 47   ON/OFF HIRE SURVEY



RIDER CLAUSES FOR
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

2nd ORIGINAL

CLAUSE 48   CONTRABAND

CLAUSE 49   BILLS OF LADING

CLAUSE 50   BUNKER CLAUSE

CLAUSE 51   INCLUDED CLAUSES AND GENERAL AVERAGE

CLAUSE 52   GOVERNING TIME

CLAUSE 53   HOUSE FLAG & FUNNEL

CLAUSE 54   CONFIDENTIALITY

CLAUSE 55   OWNERS AGENCY SERVICES

CLAUSE 56   CONTAINERS ON DECK

CLAUSE 57   VESSEL'S MANNING

CLAUSE 58   MISCELLANEOUS VOYAGE EXPENSES

CLAUSE 59   EXTRA INSURANCE

CLAUSE 60   GOVERNING LAW

CLAUSE 61   FUEL SULPHUR CONTENT CLAUSE

CLAUSE 62   WEATHER ROUTING

CLAUSE 63   ISPS CLAUSE FOR TIME CHARTERS

CLAUSE 64   OWNERS' BANK DETAILS AND NON-PAYMENT OF HIRE

CLAUSE 65   WAR RISKS

CLAUSE 66   ICE CLAUSE

CLAUSE 67   BALLAST BONUS

CLAUSE 68   BOTH TO BLAME COLLISION CLAUSE

CLAUSE 69   GENERAL AVERAGE AND THE NEW JASON CLAUSE



**2nd ORIGINAL**

## RIDER CLAUSES FOR
## CHARTER PARTY 15th MARCH 2013
## MURCIA CARRIER

### CLAUSE 26 – VESSEL DESCRIPTION

Del Monte                                                                    **N** ORBULK

| Vessel Name | MURCIA CARRIER |
| Owners full style | GIRALDA SHIPPING CORPORATION |
| Built | 1996 STOCZNIA GDANSK POLAND |
| Flag | PANAMA |
| Call Sign | 3FJZ2 |
| Inmarsat C | 437030513 |
| Telephone | 765110968, 765110961   Mobile: + 44 7972660352     Iridium 00881677729212 |
| Facsimile | 765110970 |
| Email | master.murcia@norbulkglw.co.uk |
| Class | BUREAU VERITAS    BV IE/3E ICE III |
| GRT/NRT | 9438 / 4037 |
| Panama GRT/NRT | 17967 |
| Suez GRT/NRT | 10195/7443 |
| DWT/Draft | 9357 8.85m       Banana Draft 7.00M |
| Cft/Sqm | 427,806 , 4,948 |
| LOA/LBP/Beam/Depth | 137.7M,126.7M 21.5M, 13.15M |
| Light Weight | 5,685 |

| Con.Cap.on deck | 99TEU | 62FEU |
| Under Deck | 62TEU | 32FEU |
| Cont.stack weight (MT) | | |
| Reefer Plugs | 52 | |

Speed/Consumption(Fuel Quality)

| | | 17.0 | 18.0 | 19.0 | 20 | Aux Engines at sea |
|---|---|---|---|---|---|---|
| AT FULL SPEED | | | | | | |
| A/Eng Consumption Included in daily fig. | HFO Ballast | 28.0 | 31.0 | 34.0 | 38 | 3.5 |
| | HFO Banana | 31.0 | 32.6 | 36.0 | 40.5 | 5.5 |

| Bunker's capacity | | | |
| 100% Cu.Mtrs. | ifo1350 | mdo 150 | |
| MAX RPM/BHP | 122 RPM, 13423 BHP | | |
| Engine Type | MAN B&W MC60 (10.010kw) AT 127 rpm | | |
| Vent//Air circulation | 2/1 P/HOUR 90/60/30 P/HOUR | | |
| Generators | Bergen x 1.020kw x 4 units     440V - 60hz | | |
| Temperature Range | -25c - +15c | | |
| C.A.fitted | Piping fitted CA Module to be installed | | |
| Type of gear/capacity | 4 cranes , 2x32tonnes 2x8tonnes | | |
| Hold/Hatches/Comp. | 4 holds/ 16 decks     4 side doors | | |
| Grating deck strength | Fork Lift 7.0 m/ts on pneumatic tyres | | |
| Hold deck height | 2.27 minimum "B" deck no 1 hold. | | |
| Cooling Sections | 8 | | |
| Hatch Dimensions | Wx Deck 10.070mx9.780m | | |

| | | NO.1 | | NO2 | | NO.3 | | NO.4 | |
|---|---|---|---|---|---|---|---|---|---|
| | H/C | CU FT | SQ M | CU FT | SQ M | CU FT | SQ M | CU FT | SQ M |
| | FCSL | 39,270 | 404 | | | 35,209 | 348.0 | 33,479 | 343 |
| | A | 29,382 | 331 | 33,891 | 358 | 28,605 | 355 | 29,064 | 381 |
| | B | 16,881 | 192.0 | 27,087 | 341 | 28,817 | 353 | 28,994 | 351 |
| | C | 9358 | 118 | 22,248 | 271 | 27051 | 326 | 22001 | 270 |
| | D | | | 16669 | 206 | | | | |
| Totals | | 94,891 | 1045 | 99,695 | 1176.0 | 119,682 | 1,382.0 | 113,538 | 1345 |

*All above figures are about but WOG*

3



RIDER CLAUSES FOR            2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 27 - GRATINGS

The Vessel is to be fitted with portable gratings on all the decks.  Maintenance of the
gratings is to be for Owners' account, unless damage caused by negligence of stevedores
during cargo operations.

## CLAUSE 28 – REFRIGERATION MACHINERY

The Vessel's refrigeration machinery and insulation will maintain, simultaneously,
separate temperatures in each of her eight (8) cooling sections as required by the
Charterers but not below minus 25 degrees Celsius, during the whole duration of any
voyage for carrying full cargoes of frozen fish and/or other frozen food commodities.
The refrigeration machinery and appliances in the Vessel shall at all times be up to
Lloyd's R.M.C. or equivalent and are to be maintained in that class for the whole
duration of this Charter.

## CLAUSE 29 – REFRIGERATION

The Owners shall at all times provide a valid refrigeration certificate issued by a
recognized classification society attesting the good working order of the vessel's
refrigeration equipment.  The ship's Officers shall ensure that the temperatures as
directed in writing by Charterers are adhered to explicitly within the ordinary accepted
practice applicable to the cargo being carried, and that the ventilation as installed is
functioning as required by the Charterers.  In effect the Owners are responsible for the
good condition and proper functioning of the refrigeration equipment as installed and in
accordance with the instructions of the Charterers.  The refrigeration machinery and
appliances shall always be under the supervision and control of a fully qualified
refrigeration engineer.  The Officers are to be fully qualified, experienced and skilled in
the handling and transportation of refrigerated cargoes.  All supplies that are necessary
for the maintenance and operation of the refrigerated machinery are to be entirely for the
Owners' account.

## CLAUSE 30 – DISTANCE THERMOMETERS

The Vessel is to be equipped with reading distance thermometers accessible in engine
control room and CO2 detectors, which are to be maintained in good working order for
the whole duration of this Charter.

4



RIDER CLAUSES FOR                        2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 31 – SPEED AND CONSUMPTION

The Master shall before and during the sea voyages see to it that the Vessel is trimmed in
the most economical way in respect to speed and consumption and also otherwise
endeavor to achieve low running cost for the Vessel.  It is further agreed that no bunker
claims shall be made when extra bunkers consumed by reason of fouling caused by the
trading of the Vessel.

## CLAUSE 32 – ELECTRIC LIGHT

The Vessel to supply, as and when required, sufficient electric light and lamps at all
hatches and in all hold for night work.

## CLAUSE 33 – STEVEDORE DAMAGE

Should any damage, which affects Vessel's seaworthiness, be caused to the Vessel and
her fittings by the Charterers or their stevedores, the Master is to endeavor to obtain
written acknowledgement of the responsible party and have a survey made to define and
estimate the damage, in agreement with the ship's agent or supercargo (unless damage
should have been repaired in the meantime).  If Master is unable to arrange then he is to
immediately inform Charterers before leaving the port where damage occurred.

## CLAUSE 34 – BREAKDOWN OF WINCHES

In the event of a breakdown of shipboard cranes by reason of disablement of insufficient
power, the hire to be reduced pro rata for the period of such inefficiency in relation to the
number of hatches available.  Charter hire will not be reduced during the period a shore
appliance has been hired for Owners' account.  This clause is not valid if breakdown due
to the negligence of the stevedores.

## CLAUSE 35 – VESSEL'S CERTIFICATES

The Owners confirm that the Vessel has full certificates to operate within the trading
limits and warrant to maintain them for the duration of the Charter Party.

Vessel to have a valid Asian Gypsy Moth inspection certificate for the duration of this
voyage.



RIDER CLAUSES FOR                               2ⁿᵈ ORIGINAL
CHARTER PARTY 15ᵗʰ MARCH 2013
MURCIA CARRIER

## CLAUSE 36 – INSURANCE PREMIUM

Charterers to have the benefit of any return of insurance premium receivable to Owners
from Underwriters (as and when received from Underwriters) by reason of Vessel being
in port for a minimum of 30 days provided Vessel is on hire.

## CLAUSE 37 – SUPERCARGO

The Charterers are to have the right to embark a supercargo on the Vessel, if the
accommodation permits, the same not to be considered as a passenger, but to be treated
as an Officer of the Vessel.  The Charterers are to pay U.S. Dollars **$15** per day for
victualling, excluding wines and spirits.  Any extra meals supplied on board on
Charterers' request to be paid by Charterers at cost price, but not exceeding U.S. Dollars
**$10** per meal.

Should Charterers embark a supercargo, it is understood that Charterers relieve Owners
from all responsibility for accident to such supercargo whilst on board and that any claim
whatsoever will be settled by the Charterers.  Charterers' supercargo to sign standard
letter of indemnity as required by Owners' P&I club.

## CLAUSE 38 – DETENTION/OFF-HIRE/PUT BACK

If upon the voyage speed be reduced by defect in or breakdown of any part of the
Vessel's hull, machinery or equipment, the time so lost and the cost of any extra fuel
consumed in consequence thereof and all extra expenses shall be deducted from hire.

Should the Vessel have to deviate (which expression includes putting back or putting into
a port other than that to which she is bound under the instruction of Charterers) while on
voyage by reason of an accident or breakdown, the hire shall be suspended from the time
of deviating until such time as the vessel be again in an efficient state to resume her
service where the accident occurred or at the same distance from the original destination,
with all cargo and bunkers reloaded if any discharged.

This shall include deviation caused by sickness or by accident to crew or any person on
board the Vessel (other than passengers or supercargo traveling under Charterers'
auspices).  In addition, the fuel consumed and port charges, pilotage and all other
expenses consequent upon putting into port shall be borne by the Owners.

The Owners are to be credited for any bunker savings as a result of any slow steaming
specific to detention, off-hire and put back.

Any deductions from the hire are to be mutually agreed.



RIDER CLAUSES FOR       2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 39 – CARGO

Cargo shall be loaded, stowed, tallied, trimmed and discharged by the Charterers at their risk and expense under Master's supervision. The Owner is not to be responsible for shortages, mixture of marks, nor for number of packages or pieces, nor for the damage or claims on cargo caused by bad stowage.

## CLAUSE 40 – TYPES OF CARGO

Frozen fish in cartons up to vessel's full capacity which is always to be non-injurious to vessel and/or vessel's insulation, under and on deck.

Charterers to have the liberty to load and carry in the Vessel, any lawful refrigerated or dry cargo not of a nature likely to be injurious to the Vessel's structure, decks, bins, gratings, insulation, etc.

## CLAUSE 41 – STOWAWAYS

(A)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercises of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter of the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the vessel be arrested as a result of the Charterers' breach of Charter according to sub clause (A)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(B)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.



RIDER CLAUSES FOR        2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the good and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable, time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

## CLAUSE 42 – U.S. CUSTOMS ADVANCE NOTIFCATION/AMS CLAUSE FOR TIME CHARTER PARTIES

(A) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    (i)    Have in place a SCAC (Standard Carrier Alpha Code);
    (ii)   Have in place a ICB (International Carrier Bond);
    (iii)  Provide the Owners with a timely confirmation of (i) and (ii) above; and
    (iv)  Submit a cargo declaration by AMS (Automated Manifest System) to US Customs and provide the Owners at the same time with a copy thereof.

(B) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs arising from the Charterers' failure to comply with any of the provisions of sub-clause (A).  Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(C) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(D) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## CLAUSE 43 – OWNERS' RESPONSIBILITY

Owners shall remain responsible for the navigation of the Vessel, her insurance, maintenance of the crew and all other matters of ship's husbandry.



RIDER CLAUSES FOR                            2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 44 – CLEANING OF HOLDS

(A) The Charterers may request the Owners to direct the crew to sweep and/or wash and/or clean the holds between voyages and/or between cargoes against payment at the rate of USD **$1,000** for sweeping and USD **$1,500** for washing, provided the crew is able safely to undertake such work and is allowed to do so by local regulations.  In connection with any such operation the Owners shall not be responsible if the Vessel's holds are not accepted or passed.  Time for cleaning shall be for the Charterers' account.

(B) All materials (including chemicals and detergents) required for cleaning of cargo holds shall be supplied and paid for by the Charterers.

(C) Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

The Charterers have the option of redelivering the vessel without cleaning holds against the lump sum payment of USD **$2,500** to the Owners.

The opening and closing of hatches where permitted are to be performed by the Vessel's crew.

On delivery vessel to be free from any smell and have clean holds.

## CLAUSE 45 – INSURANCE

P&I Club – British Marine
H&M Provider – Allianz
H&M Value - USD $ **7,000,000.00**

## CLAUSE 46 – WATCHMEN

Expenses for watchmen (gangway, etc.) ordered by the Master to be for Owners' account, unless watchmen are compulsory, in which case the expenses will be for Charterers' account.

## CLAUSE 47 – ON/HIRE SURVEY

Master's bunker figures to be used for delivery and redelivery purposes.



RIDER CLAUSES FOR                    2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

Joint on-hire and off-hire surveys shall be conducted by mutually acceptable surveyors at ports or places agreed. The on-hire survey shall be conducted without loss of time to the Charterers, whereas the off-hire survey shall be conducted in the Charterers time. Survey fees and expenses shall be shared equally between the Owner and Charterers.

## CLAUSE 48 – CONTRABAND

The Owners of the vessel, their employees, crew and their agents, warrant that they have entered into a carriage initiative agreement with the US Customs and are in compliance with the terms of the said agreement and with the provisions of the US anti-Drug Act of 1986 (and any amendment thereto) and will exercise the highest degree of care and diligence to ensure no illicit drugs, contraband, or unmanifested, illegal, or mis-described cargo is allowed on or carried on the vessel.

Charterers shall be responsible for fines arising out of the carriage of illegal cargo where Charterers have directly caused the carriage of such illegal cargo. Owners shall be responsible for any fines arising out of the smuggling of drugs by Owners, Officers or Crew.

In this regard any watchmen/divers ordered by Charterers and paid for by their agents to be shared equally by Charterers and Owners.

The Charterers are to be responsible for their employees, servants and/or agents with respect to this clause.

## CLAUSE 49 – BILLS OF LADING

Charterers or their agents are authorized to sign Bills of Lading on behalf of Master in accordance with loading tally mate's receipts, etc. The Vessel shall not perform an outturn tally unless specifically requested by the Charterers. Any tally will be performed as a service to the Charterers and the terms of such will be agreed between the Owners and Charterers.

## CLAUSE 50 – BUNKER CLAUSE

The Vessel is to be delivered with bunkers onboard and Charterers to redeliver with about same quantities. Any minor difference to be settled at mean Platts price applicable at the port of redelivery at time of redelivery or closest thereto. In the case that there is no Platts price quoted for the port of redelivery, the Platts average price at the nearest port quoted by Platts to apply.

10

RIDER CLAUSES FOR                                2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 51 – INCLUDED CLAUSES AND GENERAL AVERAGE

(A) The New Jason and the Both-to-Blame Collision Clause, as attached, are deemed to form part of this Charter Party.  All conditions in this Charter Party which conflict with these clauses are to be void to the extent of such conflict.

(B) The New Jason, and Both-to-Blame Collision Clause and the appropriate of the following clauses paramount are to be incorporated directly or implication in all Bills of Lading issued under this Charter Party.

      1. Canadian Clause Paramount in respect of shipments to and from the USA.

      2. USA Clause Paramount in respect of shipments to and from the USA.

      3. In all other instances Bills of Lading issued under this Charter Party shall give effect to the Hague-Visby Rules applicable in the circumstances.

## CLAUSE 52 – GOVERNING TIME

The delivery and redelivery times should be based on GMT.

## CLAUSE 53 – HOUSE FLAG & FUNNEL

Not applicable.

## CLAUSE 54 – CONFIDENTIALITY

This fixture is to be kept private and confidential.

## CLAUSE 55 – OWNERS AGENCY SERVICES

The Owners may appoint their own agent for any crewing matters and/or husbandry items.  Owners are free to appoint Charterers agent for these matters free of any additional fee and any costs or disbursements to be handled directly by Owners with Charterers agent.

11



RIDER CLAUSES FOR                    2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 56 – CONTAINERS ON DECK

Charterers are at liberty to carry containers within the physical safety constraints of the Vessel and her fittings and always in accordance with the Master's instructions.

Owners accept no responsibility for loss or damage to equipment or cargo carried in integral refrigerated containers carried on deck caused by any malfunction, failure or breakdown of the container refrigeration machinery whether mechanical or electrical or whether caused by failure of gas supply or fault or error in the temperature recording system.  Charterers hereby indemnify and hold harmless the Owners against all claims and consequences arising from the above.

Charterers shall ensure that any containers provided are compatible with the ship's power supply and are fitted with plugs compatible with the ship's power sockets. Charterers are to provide the ship with adequate spare parts and documentation (maintenance and repair manuals) and refrigeration gas and lubricating oil for the duration of the intended voyage. Owners, however, accept no responsibility where repairs cannot be effected due to faulty workmanship of the crew or due to lack of spare parts or refrigeration gas.

All Bills of Lading issued under this Charter Party for cargo carried on deck in containers to be clearly endorsed "SHIPPED ON DECK AT SHIPPERS'/RECEIVERS' RISK AND EXPENSE".

In case of failure to comply with this provision, Charterers herby affirm that they will hold harmless and indemnify the Vessel, her Owners, managers, operators, agents and crew.  In respect of any and all liability, loss or damage whatsoever, including all costs, expenses and legal fees, which any of the aforementioned parties may sustain by reason of any claimant alleging said carriage is a deviation and/or in violation of the terms of the applicable contract of carriage and/or COGSA, or any similar legislation.

## CLAUSE 57 – VESSEL MANNING

The Owners of the Vessel undertake that the minimum terms and conditions of employment of the crew of the Vessel are now or will be prior to delivery of the Vessel into this Time Charter, and will remain so for the period of this charter, covered by Bona Fide Trade Union Agreement.

## CLAUSE 58 – MISCELLANEOUS VOYAGE EXPENSES

Charterers shall pay to Owners together with hire the amount of USD **$1,500** per calendar month for communication and representation.

12

RIDER CLAUSES FOR                               2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

## CLAUSE 59 – EXTRA INSURANCE

Extra insurance as per Box 17.


## CLAUSE 60 – GOVERNING LAW

This Charter Party is to be construed by and in accordance with English Law with jurisdiction in London.


## CLAUSE 61 – FUEL SULPHUR CONTENT CLAUSE

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 MARPOL Annex VI, including the Guidelines in respect of sampling and the provisions of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (A).

(B) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (A), the Owners warrant that:

    (i)     The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

    (ii)    The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 Annex VI.

(C) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.



RIDER CLAUSES FOR                    2ⁿᵈ ORIGINAL
CHARTER PARTY 15ᵗʰ MARCH 2013
MURCIA CARRIER

## CLAUSE 62 – WEATHER ROUTING

(A) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to belief that such a route will compromise the safe navigation of the Vessel.

(B) In the event the Charterers supply the Master with weather routing information, although not obliged to follow such routing information, the Master shall comply with the reporting procedure of that service.

## CLAUSE 63 – ISPS CLAUSE FOR TIME CHARTERS

(A)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and the "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements to the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request, the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(B)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners."*



RIDER CLAUSES FOR          2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

(ii) Loss, damages, expenses or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(C) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(D) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## CLAUSE 64 – OWNERS' BANK DETAILS AND NON-PAYMENT OF HIRE

BANKING DETAILS –

In US Dollars To :
Bank :          Bank of America
New York, NY
ABA:
Swift code:
Acount number:
FAVOUR OF:          Network Shipping
                    Ltd.

NON-PAYMENT OF HIRE -

(A) The Owners shall notify the Charterers in writing if hire payment is overdue. If the payment is note received by the Owners within **three** days, the Owners may withdraw the Vessel. Such right of withdrawal shall be without prejudice to any other rights that the Owner may have under this Charter Party.

(B) The Charterers shall indemnify the Owners in respect of any liabilities incurred by the Owners under the Bill of Lading or any other contracts of carriage as a consequence of the Owners' suspension of and/or withdrawal from any or all of their obligations under this Charter Party.

(C) If, notwithstanding any to the contrary in this Clause, the Owners choose not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of hire or a serious of late payments of hire, this shall not be construed as a

15

RIDER CLAUSES FOR                         2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

waiver of their right to withdraw the Vessel under sub-clause (B) in respect of any subsequent late payment under this Charter Party.

## CLAUSE 65 – WAR RISKS

(A) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(B) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(C) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(D)(i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such

16

RIDER CLAUSES FOR                    2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(E) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(F) The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(G) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port of such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

17

RIDER CLAUSES FOR                    2nd ORIGINAL
CHARTER PARTY 15th MARCH 2013
MURCIA CARRIER

(H) If in compliance with any of the provisions of sub-clauses (B) to (G) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

## CLAUSE 66 – ICE CLAUSE

Not applicable.

## CLAUSE 67 – BALLAST BONUS

Not applicable.

## CLAUSE 68 – BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship come into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by other on-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## CLAUSE 69 – GENERAL AVERAGE AND THE NEW JASON CLAUSE

General average shall be payable in London according to the York/Antwerp Rules, 1994, where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

18

2nd ORIGINAL

### RIDER CLAUSES FOR
### CHARTER PARTY 15th MARCH 2013
### MURCIA CARRIER

**NEW JASON CLAUSE**

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.  If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully if the said salving ship or ships belonged to strangers.

Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

And the Charterers shall procure that Bills of Lading issued under this Charter Party shall contain same clause.

19

